```
 1                UNITED STATES DISTRICT COURT
                       DISTRICT OF KANSAS
 2

 3   ALEXIS SWEARINGEN,

 4                     Plaintiff,

 5     vs.                    Case No. 20-cv-2630-DDC-TJJ

 6   LINN COUNTY, KANSAS,
     PLEASANTON UNIFIED SCHOOL
 7   DISTRICT 344,

 8                     Defendants.

 9           THE VIDEOCONFERENCE DEPOSITION OF
                       PAUL FILLA
10

11   produced, sworn and examined on the part of the

12   Plaintiff, pursuant to Notice of Deposition, on

13   the 2nd day of December, 2021, beginning at 9:55

14   a.m., at each parties' respective home/office,

15   with the reporter physically located at 1803

16   Oakridge Drive, in the City of Junction City,

17   County of Geary, and State of Kansas, before me.

18

19              Sandra K. Powers, C.S.R.,

20

21   a Certified Shorthand Reporter in and for the

22   State of Kansas.

23

24

25
```

CERTIFIED COPY

CHRISTOPHER VIDEO & REPORTING                    1100 Main Street, Suite 2060
816.471.7800  cvandr.com  816.471.7998 (Fax)       Kansas City, Missouri  64105

EXHIBIT 1

Page 2

```
 1              A P P E A R A N C E S
 2
 3    For Plaintiff:
 4       DRZ LAW, LLC
         8700 State Line, Suite 305
 5       Leawood, Kansas 66206
         913.400.2033
 6       chris@drzlawfirm.com
         By:  Mr. Christopher Dove
 7
 8    For Defendant Pleasanton
      Unified School District 344:
 9
         FISHER PATTERSON SAYLER & SMITH
10       9393 West 110th Street
         Suite 300, Building 51
11       Overland Park, Kansas 66210
         913.339.6757
12       alee@fpsslaw.com
         By:  Ms. Abbey Lee
13
14    For Linn County, Kansas:
15       CASE LINDEN
         2600 Grand Boulevard
16       Suite 300
         Kansas City, Missouri 64108
17       866.288.1626
         kevin.case@caselinder.com
18       By:  Mr Kevin Case
19
20
21
22
23
24
25
```

Page 3

```
 1                   I N D E X
     WITNESS                                   PAGE
 2
     PAUL FILLA
 3
 4   Direct-examination by Mr. Dove              4
 5   Cross-examination by Mr. Case              56
 6
 7
 8
 9
10
11   Errata Sheet                               57
12   Signature Letter                           58
13
14   Certificate of Certified
     Shorthand Reporter                         59
15
```

Page 4

```
 1            PAUL FILLA,
 2   of lawful age, having been first duly sworn on his
 3   oath to state the truth, and nothing but the
 4   truth, deposes and says:
 5              DIRECT EXAMINATION
 6   BY MR. DOVE:
 7       Q.  Good morning.  Could you please state
 8   your name for the record?
 9       A.  Paul Filla, F-i-l-l-a, (spelling).
10       Q.  Mr. Filla, thank you.  Mr. Filla, where
11   do you live now?
12       A.  I've got a Pleasanton, Kansas address.
13       Q.  Okay.
14       A.  Rural Pleasanton, I guess you could say.
15       Q.  I'm sorry, I didn't mean to cut you off.
16   Could you say that again?
17       A.  Rural Pleasanton.
18       Q.  Rural Pleasanton.  And are you employed
19   right now?
20       A.  No.
21       Q.  Was your prior job as Sheriff of Linn
22   County?
23       A.  Yes.
24       Q.  Okay.  And how long were you the Sheriff
25   of Linn County?
```

Page 5

```
 1       A.  I think I figured out, been nine years.
 2   I retired the year prior to the end of my second
 3   term.
 4       Q.  Do you remember what year that was?
 5       A.  '19 maybe.
 6       Q.  2019?
 7       A.  No, let's say '18, because '19 was
 8   election year, wasn't it?  Yeah, '18, September of
 9   '18.
10       Q.  September, 2018?  Okay.
11       A.  Yeah.
12       Q.  And when did you start as Sheriff of Linn
13   County?
14       A.  Nine years prior to that, so would have
15   been '12.  I think we got sworn in on January of
16   2012.
17       Q.  January of 2012?
18       A.  Yep.
19       Q.  Okay.  And prior to being Sheriff of Linn
20   County were you Chief of Police for La Cygne?
21       A.  Yes, just prior to Sheriff, yes.  I
22   worked for the Sheriff's Department until Sheriff
23   Walker got elected and then I went to work for the
24   City of La Cygne.
25       Q.  How long did you work for La Cygne?
```

Page 34

1 parent whose name was Chasity Greene; you see this
2 up at the top?
3    A.  Yeah.
4    Q.  She also makes this allegation towards
5 the end of her e-mail about how -- what she says
6 here is, "I have also heard from other people how
7 they do not trust him around their girls, which
8 makes me even more uneasy."  Did you investigate
9 that allegation at all?
10   A.  I can't say that I did.  I don't recall
11 that.  I'm sure Travis and I talked about it but I
12 don't have any direct recollection of that, so...
13   Q.  Did anyone at the Sheriff's Office review
14 Mr. Huggins' text messages or social media
15 messages after this e-mail?
16   A.  I don't have any recollection of that.  I
17 don't think so.
18   Q.  Was Mr. Huggins' attempt to friend a
19 student on social media, was that a violation of
20 any policy of the Sheriff's Office or Linn County?
21   A.  No.
22   Q.  Do you know if this event and the
23 reaction to it, if it ever showed up on a review
24 of Mr. Huggins?
25   A.  No, don't recall.

Page 35

1    Q.  So --
2    A.  I'm not saying -- it was addressed with
3 him, I know that, but did it ever show up
4 officially, no.
5    Q.  Uh-huh.  And so it was addressed with him
6 by telling him this is inappropriate; is that
7 correct?
8    A.  Yes.  I gave him basically the same
9 message Travis gave him.
10   Q.  So combined with what happened at
11 La Cygne with Ms. Callahan and then in this event,
12 did this start to raise any red flags in your mind
13 about Mr. Huggins' conduct around minor females?
14   A.  I can't say that it did.  I know Travis
15 and I talked about it and Travis -- you know, I
16 don't remember explicitly what he said but, you
17 know, he was more concerned with him, you know,
18 being friends with anybody on Facebook.
19   Q.  Okay.  Do you recall -- so this is -- the
20 date of this e-mail is August 3rd, 2017.
21   A.  Uh-huh.
22   Q.  So this would have been over the
23 summertime, right, not during the school year?
24   A.  Right, it would have been -- yeah, summer
25 winding down.

Page 36

1    Q.  And do you recall over this -- well,
2 let's take away the date.  Do you recall at any
3 point receiving some information from Melissa
4 Garrett about Mr. Huggins and Alexis Swearingen at
5 Ms. Garrett's restaurant?
6    A.  I remember receiving information but I
7 don't think it was from her.
8    Q.  Who did you receive the information from?
9    A.  It might have been from Chip Moore, Tommy
10 Moore.
11   Q.  Did you say Chip Moore?
12   A.  Tommy Moore.
13   Q.  Oh, Tommy Moore?
14   A.  That's his name.  He goes by Chip.
15   Q.  Gotcha.  And is Tommy Moore a deputy?
16   A.  Yes.
17   Q.  So what did Tommy Moore tell you?
18   A.  Exactly what you just repeated, that
19 sitting in a booth with one foot -- somebody's
20 foot between their legs, didn't think it was quite
21 right.
22   Q.  Okay.  And do you know how Tommy Moore
23 got the information?
24   A.  I don't -- and I'm not sure it was
25 actually from Tommy, but it was from somebody but

Page 37

1 it wasn't from Garrett, I know that.
2    Q.  So it was from someone else who saw this
3 happen who was at the restaurant, is that what
4 you're saying, but not Melissa Garrett?
5    A.  Yeah, I don't recall anything coming from
6 the Garretts, no.
7    Q.  Okay.  Well, who do you think it might
8 have been?
9    A.  I don't know.
10   Q.  Okay.
11   A.  I say Tommy Moore -- or Chip Moore, but
12 it may not have been him either, but I did hear
13 about it.  I did hear about it, so...
14   Q.  What is it that makes you think it didn't
15 come from Melissa Garrett?
16   A.  Because I didn't get anything from
17 Garretts.
18   Q.  Oh, I know, but the original source of
19 the information, I think you said you don't think
20 it came from Melissa Garrett.  I'm curious as to
21 why you think that.
22   A.  Because I didn't get anything from
23 Garrett ever.
24   Q.  Oh, I understand, but in terms of whoever
25 told you their source of information, do you have

Page 38

1  any idea who that was?
2       A.  You already asked me that and I said I
3  don't recall right offhand but I'm thinking it
4  might be Chip, but it could very easily have been
5  somebody else.  The fact is I did know about it.
6       Q.  Okay.
7       A.  And when I found out about it I'm not
8  exactly sure, but it was when things started to go
9  south for Huggins.
10      Q.  Was it over the summer or the fall, do
11  you recall that?
12      A.  No.
13      Q.  And when you received the information
14  what did you do?
15      A.  I believe at that time, the time I
16  received it, it might have been when we were
17  getting ready to pass it off to the KBI and I gave
18  them that information.
19      Q.  So did anyone at the Sheriff's Office
20  talk to Mr. Huggins about this incident?
21      A.  I don't recall.  I don't know.
22      Q.  Did anyone at the Sheriff's Office
23  investigate the incident?
24      A.  You know, I keep saying I don't know.  It
25  seems to me that this was about -- when it came to

Page 39

1  my attention it was close to the time we were
2  getting ready to turn it over to the KBI and we
3  passed that on to them at that time.
4       Q.  Do you recall when you passed it on --
5  when you -- let me start this sentence over again.
6  Do you recall when you turned it over to the KBI?
7       A.  Well, it was sometime after, oh,
8  September 27th, or in that time frame, until the
9  incident -- well, I would say it was closer to the
10  27th of September, but it was certainly before the
11  blowup with Ryan on October, I think, 10th or 11th
12  or something like that.
13      Q.  Why did you decide to contact the KBI?
14      A.  Because the information that we were
15  receiving from Chip, or Tommy, was that the Navy
16  guy -- it could have been the Navy guy, and there
17  was information that -- you know, that possibly
18  Huggins could have been involved, and so I got
19  ahold of them and told them -- if it was a
20  criminal -- if it's criminal so -- I just think
21  it's much cleaner if we get the KBI involved,
22  there's no head hunting on our part and no
23  Watergating it so -- and any time there's -- you
24  know, there's a criminal activity I turn it over
25  to the KBI.

Page 40

1       Q.  Uh-huh.
2       A.  And they told me -- and I believe it was
3  Bill Smith who's the supervisor agent of Ronnie
4  Burke, said don't do anything with Huggins at this
5  point and we'll tell you, you know, when to
6  suspend him or fire him or any of that sort of
7  stuff.  They didn't want to key him off at that
8  point.
9       Q.  So Bill Smith told you not to remove Mr.
10  Huggins from the school?
11      A.  Yeah, don't -- yeah, don't tip him off,
12  let us get going first.
13      Q.  Do you remember when he told you that?
14      A.  Well, sometime after the 27th of
15  September, and the 11th of October when the -- I
16  believe that was a Wednesday when Ryan and Mitch
17  Shaw had a bowwow and he was asked to be removed
18  from the school, and Allen Huggins was seen taking
19  him out of the school and joking around with him
20  outside, and I think that -- that was a Wednesday,
21  I think, and probably on Friday we took him out of
22  the school because of that.
23      Q.  Okay.  So the Sheriff's Office removed
24  Mr. Huggins from the building because they saw him
25  joking around with Mr. Swearingen?

Page 41

1       A.  Right, and, yeah, they thought that it
2  wasn't handled correctly, and, of course, Huggins
3  -- Huggins and the Swearingens were friends so --
4  but in order to keep peace with the school -- and
5  you got to remember, one of the main reasons we
6  put School ReSource Officers in the school is to
7  have good relationship with not only students but
8  the administration, so it had soured quite a bit
9  with both Mitch and Travis because of the way it
10  was handled.
11      Q.  So even though the KBI told you to leave
12  him there you decided --
13      A.  Yeah, but I talked to him about it, and
14  it was okay because we used that as the impetus to
15  remove him, not anything else.
16      Q.  These communications with Mr. Smith,
17  between you and Mr. Smith, were they by phone or
18  by e-mail?
19      A.  Phone.
20      Q.  Did you tell the school that you had
21  turned an investigation over to the KBI involving
22  Mr. Huggins?
23      A.  I'm sure I communicated that with Travis
24  because Travis and I were pretty tight and we
25  didn't keep anything from each other.