# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**ALEXIS SWEARINGEN,**

        **Plaintiff,**

v.

                                **Case No. 20-2630-DDC-TJJ**

**PLEASANTON UNIFIED SCHOOL
DISTRICT 344, et al.,**

        **Defendants.**

## MEMORANDUM AND ORDER

In 2017, plaintiff Alexis Swearingen, then 15 years old, attended Pleasanton High School in Linn County, Kansas. She met David Allen Huggins, the 44-year-old father of one of plaintiff's friends, through Huggins's daughter. Huggins, a sworn Deputy Sheriff in Linn County, worked as a School Resource Officer assigned to plaintiff's high school. He initiated a sexual relationship with plaintiff and eventually impregnated her. When other law enforcement officials discovered Huggins's conduct, they charged him with several crimes. Huggins later pleaded guilty to aggravated indecent liberties with a child, and he now resides in a Kansas prison where he's serving a 183-month sentence.

In this civil case, plaintiff has sued Linn County's Board of County Commissioners, the Sheriff for that county, and the school district who operates Pleasanton High. All three defendants now move for summary judgment against all the claims that survived earlier motion practice. These defendants readily concede that Huggins's conduct was reprehensible, and he

should have known better.  But the current crop of motions[1] requires the court to decide a similar but different question:  Who else should have known better?

The court concludes that plaintiff has shown she is legally entitled to a trial on some of her claims.  Below, after reciting the facts that control the decision at this stage, the court explains its legal reasoning.

---

[1]  The court realizes that defendant USD 344 recently filed a motion seeking leave to file an untimely summary judgment supplement.  *See* Doc. 135 ("Motion of Defendant Pleasanton Unified School District 344 to Supplement Memorandum in Support of Motion for Summary Judgment and Amend Pretrial Order").  The court hasn't received a response to this motion yet, much less a response to the substantive issue defendants seek leave to present.  This Order thus doesn't address defendant's motion for leave or the underlying substantive issue they hope to present by their supplemental motion.

**Table of Contents**

I.   Background ........................................................................................................... 4

 A.  Factual Background ......................................................................................... 4

 B.  Procedural Background ................................................................................. 18

II.  Legal Standard ................................................................................................... 19

III.   Analysis ............................................................................................................. 21

 A.  Defendant Friend's Capacity as Sheriff ....................................................... 21

 B.  Title IX Claims ............................................................................................. 23

  1.  Defendants Linn County BOCC and Friend ............................................ 25

  2.  Defendant USD 344 ................................................................................. 44

 C.  Section 1983 Claims ..................................................................................... 51

 D.  State Negligence Claims ............................................................................... 54

  1.  Defendant Linn County BOCC ................................................................ 56

  2.  Defendant USD 344 ................................................................................. 57

  3.  Defendant Friend ..................................................................................... 60

 E.  Proceeding Without Linn County BOCC ...................................................... 61

IV.  Conclusion ......................................................................................................... 62

## I.    Background

The Linn County Board of County Commissioners (Linn County BOCC) and Sheriff Kevin Friend seek summary judgment against both of plaintiff's federal claims (Title IX and § 1983) and her state law claims for negligence.  The school district defendant, Pleasanton Unified School District 344 (USD 344), seeks summary judgement against the lone federal claim asserted against it (a Title IX claim) and the state law negligence claims.  The following facts control these summary judgment motions.

### A.    Factual Background

#### *Parties and Actors*

Plaintiff Alexis Swearingen is a Kansas resident who, during the events pertinent to this suit, attended Pleasanton High School.  Doc. 109 at 2–4 (Pretrial Order ¶¶ 2.a.1., 2.a.16.).  David Allen Huggins was a Linn County Deputy Sheriff assigned to Pleasanton High School as a School Resource Officer (SRO).  *Id.* at 3 (Pretrial Order ¶ 2.a.5.).  The National Association of School Resource Officers certified Huggins for the SRO position.  *Id.* (Pretrial Order ¶ 2.a.15.).  Before joining the Linn County Sheriff's Office (LCSO), Huggins served as a police officer in the La Cygne Police Department (LCPD), a city in Linn County.  *Id.* (Pretrial Order ¶ 2.a.11.).  Defendant Pleasanton Unified School District 344 is a Kansas public school district located in Linn County.  It operates Pleasanton High School.  *Id.* at 2–3 (Pretrial Order ¶ 2.a.4.).  Defendant Board of County Commissioners of Linn County is a governmental body.  *Id.* at 2 (Pretrial Order ¶ 2.a.2.).  During the relevant period, Paul Filla served as Linn County's Sheriff.  *Id.* at 3 (Pretrial Order ¶ 2.a.13.).  Before becoming the Sheriff, Filla had served as Chief of Police for LCPD.  *Id.* (Pretrial Order ¶ 2.a.12.).  In 2019, voters elected defendant Kevin Friend as Sheriff

of Linn County.  *Id.* at 2 (Pretrial Order ¶ 2.a.3.); Doc. 115 at 33.  Plaintiff has sued Friend in his official capacity as the Sheriff.  Doc. 109 at 2 (Pretrial Order ¶ 2.a.3.).

Some of the summary judgment facts involve several persons who are not named as parties.  They are:

- Travis Laver, who served as Superintendent of Schools for Pleasanton Unified School District 344.

- Mitch Shaw, who served as Pleasanton High School's principal.

- Jessica and Ryan Swearingen, who are plaintiff's mother and father.

- Ashley Huggins, David Allen Huggins's daughter, who also was plaintiff's friend and classmate.

- Chasity Greene, who is the parent of a child attending Pleasanton High School.

- Bobby Johnson, who served as a detective with the Linn County Sheriff's Office.

- Michael Feagins, who served as an officer with the Mound City Police Department—another city in Linn County.

- Paul McKee, who served as the Chief of Police for the Mound City Police Department and also as a member of USD 344's School Board.

- Tom "Chip" More, who served as a Deputy Sheriff with the Linn County Sheriff's Office.

- John Heidrick, who worked as a teacher at Pleasanton High.

- Clint Johnson, who served as a Deputy Sheriff with the Linn County Sheriff's Office, a School Resource Officer for the Jayhawk-Linn School District, and a School Resource Unit supervisor.  In his supervisory role, Johnson was responsible for supervising all six SROs who worked in Linn County's schools.

### *USD 344 School Resource Officer Program*

The LCSO entered a Memorandum of Understanding (MOU) in January 2016 with the three school districts in Linn County, including USD 344.  Under the MOU, LCSO agreed to provide School Resource Officers to the county's middle and high schools.  Doc. 111-5 at 1 (Def. Ex. 5).  The SRO program for USD 344 didn't use grant money, relying instead on community funding.  Doc. 109 at 3 (Pretrial Order ¶ 2.a.10.).  Under this MOU, LCSO agreed to "provide SROs [who] have been certified as law enforcement officers through the State of Kansas and shall have obtained the necessary training and skills customary for officers in the Sheriff Office."  Doc. 111-5 at 3 (Def. Ex. 5).  The school districts agreed in the MOU to provide offices in school buildings "during the regular school year suitable to allow for privacy in student/faculty communications[,]" office equipment, and training "on topics such as school discipline procedures, adolescence, and special needs."  *Id.* at 3–4.  All the parties to the MOU agreed that the "SROs will be jointly supervised by the Linn County Sheriff and the Superintendent of Schools."  *Id.* at 3.  Specifically, the Sheriff agreed to supervise "their law enforcement responsibilities and ensure they are following all applicable laws[,]" while the school superintendents monitored the SROs' adherence "to the school board's policies and procedures, ensuring proper use of any and all data as it relates to a student's educational record."  *Id.*

The MOU also framed the SRO's role in the schools.  It provided that "SROs will build rapport and trust with students by maintaining a high level of visibility on campus during the regular school day[,]" and that they "will provide discussion and counseling services through classroom-based, small group-based and individual sessions with students[.]"  *Id.* at 2.  Superintendent Laver and Sheriff Filla later explained how they viewed the SRO's role:

> When an individual puts on the badge to perform duties as a law enforcement officer that person is entrusted with [a] high level of trust to the department and the community they serve. When that same officer is assigned to the school in the capacity of a resource officer there is a higher level of trust that comes with that position since they now are caring for the future of the county, the students, they serve and the staff of the school they are assigned to.

Doc. 124-15 (Pl. Ex. O).[2]  Importantly, the MOU expects the SRO to "adhere to all applicable laws of the County and State of Kansas[.]"  Doc. 111-5 at 3 (Def. Ex. 5).

Sheriff Filla assigned Huggins, then a Linn County Deputy Sheriff, as Pleasanton High School's SRO.  Huggins previously had served as an officer with LCPD, where Filla had served as Chief of Police before voters elected him as Linn County's Sheriff.  During Huggins's time with LCPD, Officer Tate West investigated a series of complaints about Huggins in 2011.  These complainants alleged Huggins had acted rudely toward a teenage girl who worked at a grocery store.  Doc. 125-6 (Pl. Ex. F).  In his report, Officer West noted that Huggins had referred to the girl as "fat ass."[3]  *Id.* at 1.  Officer West determined this part of the complaint was founded in fact, while other parts were unfounded.  *Id.* at 2.  He recommended Huggins receive a written

---

[2]    Plaintiff claims the quoted language originated in the MOU.  Doc. 124 at 9 (Pl. Resp. to Def. Mot. for Summ. J. ¶ 20); Doc. 125 at 9–10 (Pl. Resp. to Defs. Mot. for Summ. J. ¶ 20).  None of the defendants controvert this statement of fact.  Doc. 130 at 3 (Def. Reply to Pl. Resp. ¶ 20); Doc. 131 at 6 (Defs. Reply to Pl. Resp. ¶ 20).

[3]    Plaintiff also claims that Huggins, referring to the teenage girl, said "She thinks I'm a dickhead.  I'll show her a dickhead."  Doc. 124 at 11 (Pl. Resp. to Def. Mot. for Summ. J. ¶ 34); Doc. 125 at 11 (Pl. Resp. to Defs. Mot. for Summ. J. ¶ 34).  The alleged statement is included in a handwritten account attached to the official police report that, it appears, the teenage girl authored.  Doc. 125-6 at 7 (Pl. Ex. F).  The purported statement is unsigned and undated, though two "witnesses" signed it.  This statement plainly qualifies as hearsay.  *See* Fed. R. Evid. 801(a).  The statement's content reveals that its unidentified author—known in the hearsay glossary as the declarant, *see id.* at 801(b)—relied on other hearsay reports.  Specifically, the note's author declared the subject girl had reported, and her report relied in turn on what co-workers had told her.  Plaintiff presents no viable basis for the court to accept the truth of the statements asserted by the note, much less one that could carry it across the multiple levels of hearsay into evidence.  *See id.* at 805 ("Hearsay Within Hearsay").  The court thus does not treat the content of the note as part of the summary judgment facts or otherwise consider it.

letter of caution about his behavior and its reflection on LCPD.  *Id.*  Sheriff Filla reviewed this

report while Chief of LCPD, which occurred before he hired Huggins as a LCSO Deputy Sheriff.

### Spring/Summer 2017

Plaintiff and Huggins first met in March 2017 through plaintiff's friend, Ashley.  Ashley

is Huggins's daughter.  Doc. 109 at 3–4 (Pretrial Order ¶ 2.a.16.).  The two girls began eating

lunch together in Huggins's office by April of that year.  *Id.* at 4 (Pretrial Order ¶ 2.a.17.).  The

door for the SRO's office at Pleasanton High School opened to an interior hallway, and another

door opened into the transportation office.  Doc. 111-21 (Def. Ex. 21).  The transportation office

also had a door that opened into the main hallway, around the corner from the entrance to the

SRO's office and next to the exterior exit.  *Id.*  And yet another door in the transportation office

led to the school's tech lab, which also had an interior entrance down the hall from the SRO's

office.  *Id.*  Plaintiff and Ashley ate lunch together in Huggins's office frequently during the rest

of the semester, about 15–20 times.  Doc. 111-6 at 13 (Pl. Dep. 46:19–47:10).  Toward the end of

the school year, Mound City Police Chief and USD 344 School Board member Paul McKee

contacted LCSO detective Bobby Johnson to report that "parents were complaining about

[Huggins] taking [plaintiff] home from school, believing it to be inappropriate."[4]  Doc. 125-8 at

1; *see also* Doc. 125-5 at 8–9 (Johnson Dep. 24:9–25:14).

In May 2017, around the time when the school year ended, Huggins began texting

plaintiff.  Doc. 111-6 at 13 (Pl. Dep. 48:12–14).  These texts discussed his daughter and plaintiff

sleeping over at each other's house, softball practices, and other similar matters.  *Id.* at 14 (Pl.

---

[4]      Defendants object to this statement as inadmissible hearsay.  Doc. 131 at 11–12 (Defs. Reply to
Pl. Resp. ¶ 52).  But plaintiff doesn't offer this statement to prove the truth of the statement's assertions,
*i.e.*, that parents actually complained or were upset by the rides with Huggins.  Instead, plaintiff offers it
to demonstrate that LCSO and USD 344 had received reports by May 2017 about interactions between
Huggins and plaintiff.  Fed. R. Evid. 801(c).  The court thus overrules defendants' hearsay objection.

Dep. 50:24–51:8).  Plaintiff and Ashley also babysat Huggins's grandson regularly throughout the summer of 2017.  *Id.* at 15 (Pl. Dep. 56:17–24).  When Ashley moved out of Huggins's house and in with her mother, plaintiff continued babysitting Huggins's grandson by herself.  *Id.* (Pl. Dep. 57:1–2).

During the summer of 2017, plaintiff's parents became acquainted with Huggins.  They initially met Huggins when he brought Ashley over to spend the night in the Swearingen home. *Id.* at 14 (Pl. Dep. 51:9–18).  Huggins eventually befriended Ryan Swearingen—plaintiff's father—and the two hunted and watched sports together.  Doc. 111-7 at 4 (R. Swearingen Dep. 10:5–12:4).  Plaintiff's parents were aware that Huggins had exchanged text messages with plaintiff (then their 15-year-old daughter) and voiced objections to plaintiff about those exchanges.  Doc. 111-6 at 14 (Pl. Dep. 52:16–53:21).  Despite her parents' protest, plaintiff continued texting with Huggins.  *Id.*  Earlier that spring, while school was still in session, plaintiff and her mother were driving home from a concert at one in the morning when Huggins contacted plaintiff through Facebook messenger.  Doc. 111-8 at 39 (J. Swearingen Dep. 149:9– 152:9).  Huggins was working on patrol as a Deputy Sheriff when he sent this one a.m. text.  *Id.* (J. Swearingen Dep. 150:1–9).  Plaintiff's mother told plaintiff that Huggins's texting her at one in the morning was inappropriate.  *Id.* (J. Swearingen Dep. 151:21–152:5).  Plaintiff later told her father that Huggins's one a.m. text concerned a bullying incident at school.  Doc. 111-17 at 3 (Def. Ex. 17); Doc. 115-14 at 3 (Defs. Ex. 14).  Plaintiff's parents didn't report their objections or concerns about text or social media messages to any representative of the school board or LCSO.  Doc. 111-7 at 9 (R. Swearingen Dep. 30:9–13); Doc. 111-8 at 39 (J. Swearingen Dep. 152:10–19).

On August 3, 2017, Chasity Greene, parent of a Pleasanton High School student, emailed Superintendent Laver to discuss Huggins's attempt to "friend" her daughter on Facebook.  Doc. 124-9 at 1 (Pl. Ex. I).  Ms. Greene also reported that she felt "uncomfortable for [her daughter] and on edge with [Huggins,]" and that she "heard from other people how they do not trust him around their girls[.]"[5]  *Id.*  Superintendent Laver forwarded the email to Sheriff Filla, adding that he had "never witnessed anything inappropriate" and wouldn't "recommend being friends with a student on Facebook."  *Id.*  By August 4—the next day—Superintendent Laver reported to Sheriff Filla that he had discussed the matter with Huggins.  *Id.* at 2.

Sometime in or near August 2017, the sexual tone of the messages Huggins sent to plaintiff increased.  Doc. 111-6 at 14 (Pl. Dep. 52:5–7).  At some point, unspecified by the parties, plaintiff and Huggins hid their communications with one another by using "burner" phones.  *Id.* at 17 (Pl. Dep. 62:16–63:7).  Also, Huggins used a family member's phone to communicate with plaintiff.  *Id.*

On August 3, plaintiff saw Huggins at the Linn County fair.  He was on duty at the fair for the LCSO.  *Id.* at 16 (Pl. Dep. 59:20–60:4).  According to Linn County Detective Bobby Johnson,[6] Mound City police officer Michael Feagins heard plaintiff ask LCSO deputies at the fair about Huggins's whereabouts.  Doc. 125-5 at 2–3 (Johnson Dep. 10:12–11:25).  Feagins

---

[5]	Defendants object to this statement as inadmissible hearsay.  Doc. 131 at 11–12 (Defs. Reply to Pl. Resp. ¶ 61).  But plaintiff doesn't offer this statement to prove the truth of the statement itself. Instead, plaintiff offers it to demonstrate that USD 344 and LCSO had received notice from a parent worried about Huggins's behavior.  Thus, the statement doesn't qualify as hearsay.  Fed. R. Evid. 801(c). The court overrules defendants' hearsay objection.

[6]	Defendants also object to this testimony about Feagins as hearsay.  Doc. 130 at 6 (Def. Reply to Pl. Resp. ¶ 56); Doc. 131 at 12 (Defs. Reply to Pl. Resp. ¶ 56).  But plaintiff doesn't offer most of this testimony to prove the truth of Feagins's assertion—that plaintiff was asking about Huggins.  Instead, plaintiff offers it to demonstrate LCSO deputies had knowledge of reports about concerning behavior involving Huggins.  Thus, the testimony isn't hearsay.  Fed. R. Evid. 801(c).  The court overrules this hearsay objection as well.

additionally recalled seeing Huggins and plaintiff behaving in a publicly flirtatious manner during this same encounter, which he found inappropriate. *Id.* at 4–5 (Johnson Dep. 16:20–17:4). Over the next few days, Huggins spoke with plaintiff on the phone. Doc. 111-6 at 17 (Pl. Dep. 63:8–64:16). They made plans for plaintiff to ride with Huggins on his motorcycle to Paola for lunch. *Id.* The trip was planned for August 8. *Id.*

On August 8, after the two had eaten lunch together, they returned to La Cygne, and Huggins and plaintiff engaged in sex at Huggins's house. Huggins was 44 years old at the time, plaintiff was 15. *Id.* at 17–18 (Pl. Dep. 65:4–67:10); Doc. 109 at 4 (Pretrial Order ¶ 2.a.18.). Plaintiff's parents didn't know about the trip that plaintiff and Huggins took to Paola or their sexual activities. Doc. 111-6 at 17–18 (Pl. Dep. 65:18–66:4). Plaintiff does not know the exact number of times she had sex with Huggins between August 2017 and January 2018. She testified, however, that it occurred more than five times. *Id.* at 18 (Pl. Dep. 68:18–23).

During the summer and into the start of the 2017 school year, plaintiff worked at Garrett's BBQ as a server. Doc. 111-6 at 51 (Pl. Dep. 200:4–15). At some point, proprietor Melissa Garrett is alleged to have taken a photo of plaintiff and Huggins sitting across from each other at a restaurant booth. Plaintiff positioned her feet on the seat between Huggins's legs. *Id.* at 19–20 (Pl. Dep. 73:24–75:25). Plaintiff believes the incident occurred in late August or September of 2017. *Id.* at 51–52 (Pl. Dep. 201:12–202:2). Deputies from LCSO received word about this incident by late September or early October of 2017. Doc. 111-4 at 36–39 (Filla Dep. 36:1–39:12); Doc. 111-10 at 3 (Defs. Answers to Pl. Interrog. ¶ 4).

### *Fall 2017*

Pleasanton USD 344's fall semester began on September 7, 2017. Doc. 109 at 4 (Pretrial Order ¶ 2.a.19.). On September 13, plaintiff learned she was pregnant after taking a home

11

pregnancy test.  *Id.* (Pretrial Order ¶ 2.a.20.).  That night, plaintiff told Huggins of the positive

test, knowing he was the father.  Doc. 111-6 at 25 (Pl. Dep. 97:14–22).  The next day,

accompanied by her mother, plaintiff confirmed the pregnancy with a doctor.  Doc. 109 at 4.

Plaintiff did not tell her mother immediately who had impregnated her.  Doc. 111-6 at 26 (Pl.

Dep. 98:3–8).  Sometime after this doctor's appointment, plaintiff told her mother that the father

was a 20-year-old former student at Pleasanton High School then serving in the Navy.  Doc. 111-

8 at 17 (J. Swearingen Dep. 64:19–25); Doc. 111-13 at 4; Doc. 111-6 at 19 (Pl. Dep. 72:7–22).

After confirming plaintiff's pregnancy, the doctor's office informed plaintiff and her mother that

they would report the pregnancy to law enforcement officials because plaintiff was 15 years old.

Doc. 111-8 at 18 (J. Swearingen Dep. 67:6–68:16).

       Shortly after discovering her pregnancy, plaintiff told her cheer coach, Erika Gilbert, of

her condition.[7]  Doc. 111-6 at 28 (Pl. Dep. 107:4–108:19).  In late September, representatives

from the Kansas Department for Children and Families (DCF) and Tom More, a LCSO Deputy

Sheriff, interviewed the Swearingens in their home.  Doc. 111-9 at 1; Doc. 115-9 at 1 (More Aff.

¶ 3).  While DCF representatives and More interviewed plaintiff's parents, Huggins interviewed

---

[7]      In its statement of proposed facts, USD 344 places the date when plaintiff told Gilbert about her
pregnancy as October 3.  *See* Doc. 111 at 19 (Def. Mot. for Summ. J. ¶ 101).  Plaintiff does not contest
this statement of fact.  Doc. 124 at 22 (Pl. Resp. to Def. Mot. for Summ. J.).  But this date conflicts with
other parts of the record.  The passage in plaintiff's deposition that USD 344 cites merely includes
plaintiff's statement that she had told Gilbert about her pregnancy "[a]s of" October 3.  Doc. 111-6 at 28
(Pl. Dep. 107:1–9).  This ambiguity is underscored by a later deposition exchange between an attorney
and plaintiff while attempting to clarify whether the attorney was asking about "as of the date you told
your cheer coach" (*Id.* (Pl. Dep. 107:25–108:4)) or "as of October 3rd" (*Id.* (Pl. Dep. 108:5)).  The court
interprets this exchange to show that plaintiff understood defense counsel's use of the phrase "as of"
October 3 to mean *by* October 3, not *on* October 3, as USD 344 asserts.  Plaintiff later clarified, without
remembering the exact date, that she would have told her coach shortly after learning she was pregnant.
*Id.* (Pl. Dep. 108:15–17).  The timeline used by plaintiff's mother places this disclosure on September 15.
Doc. 111-9 at 1.  As USD 344's assertion of the date relies on an ambiguous reading of plaintiff's
testimony, and as plaintiff's later statement corresponds with her mother's timeline, which the parties
have stipulated is admissible evidence (Doc. 109 at 5), the summary judgment facts use the September
date for this disclosure.  That date is the one most favorable to plaintiff, the non-movant.

plaintiff about her pregnancy at her school.  Doc. 111-9 at 1.  When he did so, Huggins acted as a

representative of LCSO.  *Id.*  Plaintiff was interviewed again by More and DCF representatives

in Fort Scott the following week.  *Id.*  In interviews with law enforcement and DCF dating from

September through December, plaintiff repeated her claims that the former student had

impregnated her.  Doc. 111-6 at 38 (Pl. Dep. 147:5–148:14); Doc. 111-8 at 25 (J. Swearingen

Dep. 93:13–95:4).

The blood work from plaintiff's pregnancy test revealed a projected due date that was

inconsistent with the timeline plaintiff had claimed in her discussions with her parents and in

exchanges with law enforcement officials.  Doc. 111-8 at 18, 24 (J. Swearingen Dep. 66:2–19,

90:8–91:4).  Plaintiff's mother arranged a sonogram for plaintiff on September 30, and it

confirmed that the projected due date from the blood work was correct, and that the timeline

plaintiff had reported to others did not align with the fetus's development.  *Id.* (J. Swearingen

Dep. 66:22–67:5, 91:5–11).  Despite this discrepancy, plaintiff maintained that the former

student had impregnated her.  *Id.* at 24–25 (J. Swearingen Dep. 92:23–94:18).  After meeting

with plaintiff's parents in late September, it had become clear to More that plaintiff's timeline

didn't match her pregnancy's progress.  Doc. 115-9 at 1–3 (More Aff. ¶¶ 4, 9).

Plaintiff terminated her pregnancy at Planned Parenthood on October 4.  Doc. 109 at 4

(Pretrial Order ¶ 2.a.22.).  The following day, John Heidrick, then a teacher at Pleasanton High

School, sent Superintendent Laver an email about plaintiff.  The email inquired, "Has Mitch

[Shaw] briefed you on what is going on with [plaintiff] and SRO Huggins role in it?"  Doc. 124-

12 (Pl. Ex. L).  Heidrick accidentally copied plaintiff on the email.  Doc. 109 at 4 (Pretrial Order

¶ 2.a.23.).  In his testimony, Heidrick explained that he was worried about the number of times

Huggins had pulled plaintiff out of her classes because, uncharacteristically, her grades were

slipping.  Doc. 124-13 at 2 (Heidrick Dep. 6:8–23).  Heidrick also stated that he thought Huggins "was setting himself up to look inappropriate." *Id.*  At that time, plaintiff was not Heidrick's student, but Heidrick based his opinion on having seen plaintiff in Huggins's office several times. *Id.* at 2–3 (Heidrick Dep. 6:24–7:20).  Plaintiff testified that no sexual contact occurred in the SRO's office at the school, but Huggins had placed his hand on her shoulder and her leg while there.  Doc. 111-6 at 22 (Pl. Dep. 85:10–25).  Plaintiff also stated she and Huggins would make plans for the evening or look at plaintiff's sonogram while in his office. *Id.*

In late September or early October, Sheriff Filla contacted the Kansas Bureau of Investigation (KBI) because he had begun to suspect Huggins's involvement.  Doc. 111-4 at 39 (Filla Dep. 39:13–25).  The KBI investigators told Sheriff Filla not to suspend or fire Huggins— or remove him from the school—to avoid tipping him off that he was under investigation. *Id.* at 40 (Filla Dep. 40:2–12).  Huggins thus remained in his role as SRO.  On October 10, Huggins summoned plaintiff to leave her class and come to his office.  Huggins then let her know that Sheriff Filla had called him and told him to stay away from plaintiff.  Doc. 111-6 at 48–49 (Pl. Dep. 189:13–190:23).  Two days later, when Principal Shaw asked Huggins about the amount of time plaintiff had spent in his office, Huggins "became enraged and told [Shaw] that he would take as much fucking time as needed" to investigate plaintiff's pregnancy.  Doc. 111-20 at 1–2 (Shaw Decl. ¶ 6) (internal quotation marks omitted).

Around October 20, and after consulting with Superintendent Laver and Principal Shaw, Sheriff Filla removed Huggins as Pleasanton High School's SRO. *Id.* at 3 (Shaw Decl. ¶ 17). Sheriff Filla decided to remove Huggins from the school because of an incident on October 11. Doc. 111-4 at 40–41 (Filla Dep. 40:23–41:15).  On that day, plaintiff's father had become upset with Pleasanton High School office staff and yelled at them. *Id.*  During the incident, Huggins,

in Principal Shaw's judgment, had failed to control the situation in the office. *Id.*  On October

26, 2017, Detective Johnson sent Sheriff Filla an email, one Johnson described as a "CYA

['cover your ass'] email" for himself.  Doc. 125-8 at 1.  In it, Detective Johnson described the

timeline of information he had collected about Huggins since the spring of 2017.  *Id.*  His email

referenced:  the message he had received from McKee about parents complaining that Huggins

drove plaintiff home near the end of the prior school year; Johnson's conversation with Feagins

about plaintiff's behavior at the fair; Huggins driving plaintiff around for a fundraiser during the

summer; and Johnson's conversation with Garrett reporting that plaintiff would point out

Huggins's car whenever he drove past the restaurant.  *Id.*  Detective Johnson stated he "found no

hard evidence or physical evidence but . . . came across a lot of circumstantial statements which

[he] believe[s] give cause for further inquiry."  *Id.*

During a KBI interview in early December 2017, plaintiff told investigators for the first

time that Huggins had impregnated her.  Doc. 111-6 at 38 (Pl. Dep. 148:7–15).  Authorities

arrested Huggins in January 2018 and charged him with several crimes.  Doc. 109 at 4 (Pretrial

Order ¶ 2.a.24.).  He was fired from LCSO.  *Id.*  After he was released on bond in 2018, Huggins

had sex with plaintiff yet again.  *Id.* (Pretrial Order ¶ 2.a.18.).  Huggins later pleaded guilty to

charges of aggravated indecent liberties with a child, and a Kansas court sentenced him to 183

months' imprisonment.  *Id.* (Pretrial Order ¶ 2.a.26.)  In January 2019, plaintiff withdrew from

Pleasanton High School and transferred to a different high school in Linn County.  *Id.* (Pretrial

Order ¶ 2.a.25.); Doc. 111-6 at 4 (Pl. Dep. 12:12–23).

### *Defendants' Policies and Procedures*

Defendants maintained several policies and procedures designed to prevent child abuse,

sexual harassment, and discrimination.  *See* Doc. 124-1 (Pl. Ex. A).  Defendants also adopted

policies governing the functions and oversight of the SRO program.  *See* Doc. 111-5 (Def. Ex. 5); Doc. 124-7 (Pl. Ex. G).  The parties' summary judgment record only includes USD 344's sexual harassment policy, the SRO memorandum of understanding, and LCSO standard operating procedures.

USD 344's "Policy JGEC—Sexual Harassment" recites the school district's commitment "to providing a positive and productive learning and working environment, free from discrimination on the basis of sex, including sexual harassment."  Doc 124-1 at 1 (Pl. Ex. A).  Also, this policy asserts that sexual harassment in any form is "prohibited at school, on school property, and at all school sponsored activities, programs or events."  *Id.*  This prohibition extends to sexual harassment against individuals associated with the school, "whether or not the harassment occurs on school grounds."  *Id.*

The same policy directs all sexual harassment victims (and anyone knowing of sexual harassment) to report it immediately.  *Id.* at 2.  The policy directs students who believe they were sexually harassed to discuss the alleged harassment with the school's principal, another administrator, a guidance counselor, or other certified staff member.  *Id.*  "If the matter is not resolved to the satisfaction of the student in this meeting, the student may initiate a formal complaint under the district's discrimination complaint procedure[.]"  *Id.* at 3.  The policy also requires the school district to investigate all complaints to determine whether the alleged behavior qualifies as sexual harassment, based on the totality of the circumstances.  *Id.*  Employees who fail to report an incident they have witnessed, or any administrator who fails to investigate complaints, may face disciplinary action under the policy.  *Id.*

Defendants' MOU outlines the roles SROs are expected to play.  These roles include providing discussion and counseling services, building rapport with students by maintaining high

visibility, and responding to emergencies (according to standard law enforcement training and techniques).  Doc. 111-5 at 2.  The MOU required SROs to wear their law enforcement uniforms while on duty as SROs.  *Id.*  Also, the MOU outlines the supervisory responsibilities of USD 344 and LCSO.  USD 344 was responsible for supervising the SRO's compliance with school board policies and procedures, while the LCSO was responsible for supervising law enforcement responsibilities and ensuring that the SRO followed all applicable laws.  *Id.* at 3.  The MOU does not contain any policies or other directives explaining how to handle complaints about an SRO, or where to submit such complaints.

The LCSO's standard operating procedures for the SRO program provide that the school's principal will serve as the primary contact for SROs within each school.  Doc. 124-7 at 1.  But ultimately, the duties and activities of the SRO would follow the LCSO's chain of command.  *Id.*  The SROs also would report to a School Resource Unit supervisor, whose responsibilities encompassed observing the "SRO in the school setting on a regular basis, to include classroom instruction and other school activities."  *Id.* at 2.  Also, the unit supervisor's responsibilities included the duties to "[c]oordinate investigative assignments for [the] SRO and monitor case assignments." *Id.*

Sheriff Filla testified that the unit supervisor, Clint Johnson, didn't have daily contact with Huggins or otherwise observe him on a daily basis.  Doc. 111-4 at 30–31 (Filla Dep. 30:24–31:3).  Johnson reported on Huggins's performance annually.  Filla assumed Johnson completed those evaluations based on his interactions with Huggins while coordinating programs or from school input.  *Id.* at 31 (Filla Dep. 31:11–25).

Superintendent Laver testified that USD 344 had adopted a policy prohibiting district personnel from texting students or contacting them through social media.  Doc. 111-1 at 24

(Laver Dep. 24:9–13).  This policy expects faculty, staff, and administrators to direct communications to students through a one-way messaging app that doesn't allow students to respond to messages.  *Id.* (Laver Dep. 24:14–23).  USD 344 instituted this policy immediately after an incident where a teacher had sent inappropriate messages to a student.  *Id.* at 27 (Laver Dep. 27:10–19).

Superintendent Laver also testified that USD 344 instituted Title IX training in August 2020 because that is when the Kansas Association of School Boards ("KASB") adopted a policy requiring such training.[8]  Doc. 111-2 at 3 (Laver Decl. ¶ 22).  The parties didn't provide any evidence of Title IX training taking place before this 2020 date, and Superintendent Laver testified that he couldn't remember when the district had provided training before 2020.  Doc. 111-1 at 44–45 (Laver Dep. 44:25–45:22).  USD 344's sexual harassment policy briefly mentions Title IX as a basis for its policy.  Doc. 124-1 at 1 ("Sexual harassment is unlawful discrimination on the basis of sex under Title IX of the Education Amendments [Act] of 1972, Title VII of the Civil Rights Act of 1964, and the Kansas Acts Against Discrimination.").  But neither the MOU nor LCSO's standard operating procedures require Title IX training.  Doc. 111-5; Doc. 124-7.

### B.    Procedural Background

Defendants' summary judgment motions place all five remaining claims at issue.  Specifically:

- Defendants Linn County BOCC and LCSO seek judgment in their favor on:

---

[8]       Plaintiff objects to USD 344's assertion that the KASB didn't require Title IX training before 2020 as inadmissible hearsay.  Doc. 124 at 25 (Pl. Resp. to Def. Mot. for Summ. J. ¶ 165).  But USD 344 doesn't offer this out of court statement to prove the KASB didn't require Title IX training before 2020. Instead, it offers that statement merely to explain USD 344's state of mind, *i.e.*, that it believed in 2020 that KASB was recommending training.

> *Count I* (§ 1983 claim alleging failure to supervise and discipline staff,
> thus denying plaintiff's Fourteenth Amendment rights);
>
> *Count IV* (Title IX, 20 U.S.C. §§ 1681–1689); and
>
> *Count V* (common law negligence under Kansas law).

- Defendant Pleasanton USD 344 seeks judgment in its favor on:

  > *Count VI* (claiming deliberate indifference under Title IX); and
  >
  > *Count VIII* (common law negligence under Kansas law).

*See generally* Doc. 109 at 15 (Pretrial Order at ¶ 4.a.).

## II.   Legal Standard

Summary judgment is appropriate if the moving party demonstrates there is "no genuine dispute as to any material fact" and that the movant is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also In re Aluminum Phosphide Antitrust Litig.*, 905 F. Supp. 1457, 1460 (D. Kan. 1995). This standard dictates that the court "view the evidence and make inferences in the light most favorable to the non-movant." *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) (citing *Oldenkamp v. United Am. Ins. Co.*, 619 F.3d 1243, 1245–46 (10th Cir. 2010)).

"An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also In re Urethane Antitrust Litig.*, 913 F. Supp. 2d 1145, 1150 (D. Kan. 2012) (explaining that "[a]n issue of fact is 'genuine' if 'the evidence allows a reasonable jury to resolve the issue either way'" (quoting *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006)). "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense." *Nahno-Lopez*, 625 F.3d at

1283 (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson*, 477 U.S. at 248)).

The moving party bears "'both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law.'" *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)).  To meet this burden, the moving party "'need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim.'" *Id.* (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)); *see also In re Urethane Antitrust Litig.*, 913 F. Supp. 2d at 1150 (explaining that "a movant [who] does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim" (citation omitted)).

If the moving party satisfies its initial burden, the non-moving party "'may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.'" *Kannady*, 590 F.3d at 1169 (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49.  "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."  *Adler*, 144 F.3d at 671 (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.), *cert. denied*, 506 U.S. 1013 (1992)).

Finally, federal courts do not view summary judgment as a "disfavored procedural shortcut."  *Celotex*, 477 U.S. at 327.  Instead, it represents an important procedure "designed 'to

secure the just, speedy and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1).

## III.    Analysis

While the current motions generally implicate three theories of recovery—Title IX, § 1983, and common law negligence—the court begins elsewhere. Specifically, defendant Kevin Friend, the current Sheriff in Linn County, contends that he wasn't even the Sheriff when the relevant conduct occurred. So, he reasons, plaintiff can't possibly hold him liable for things a predecessor Sheriff did or failed to do. Part A, below, addresses this argument first because it presents the narrowest issue raised by any defendants. The court then turns in Part B to the Title IX claims. Part C takes up the § 1983 claims, and Part D concludes with plaintiff's negligence claims based on Kansas law.

### A.    Defendant Friend's Capacity as Sheriff

Plaintiff sued defendant Kevin Friend in his official capacity as Linn County Sheriff. Doc. 109 at 2 (Pretrial Order ¶ 2.a.3.). Defendant Friend argues that the court should grant judgment in his favor because he didn't become the Sheriff until October 2019, he never employed or supervised Huggins, and he has no knowledge of any event leading to this suit. Doc. 115 at 33.[9]

The Supreme Court has held that "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (citing *Brandon v. Holt*, 469 U.S. 464, 471 (1985)); *see also Prince v. Sheriff of Carter Cnty.*, 28 F.4th 1033, 1048 (10th Cir. 2022) ("An

---

[9]    Defendant Friend also argues that he deserves summary judgment because plaintiff asserts duplicative claims against him and defendant Linn County BOCC. *Id.* at 34. The court's decision to grant summary judgment in Linn County BOCC's favor on all claims, moots this argument and the court thus declines to decide it.

official capacity suit 'is, in all respects other than name, to be treated as a suit against the entity.'" (quoting *Kentucky v. Graham*, 473 U.S. 159, 166 (1985))).  To put it another way, a suit against an office holder in his official capacity "is *not* a suit against the official personally, for the real party in interest is the entity."  *Graham*, 473 U.S. at 166; *see also Keweenaw Bay Indian Cmty. v. Khouri*, 549 F. Supp. 3d 662, 711 (W.D. Mich. 2021).

Comporting with the principle in these cases, the Federal Rules of Civil Procedure provide that an "action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending."  Fed. R. Civ. P. 25(d).  The principle, as applied to government officials, is similar.  A plaintiff's official capacity suit against a public official can't proceed against a former officeholder as defendant.  *See, e.g.*, *Wakat v. Montgomery Cnty.*, 471 F. Supp. 2d 759, 767 (S.D. Tex.), *aff'd sub nom.*, *Wakat v. Montgomery Cnty. Tex.*, 246 F. App'x 265 (5th Cir. 2007).

Here, plaintiff filed her Complaint naming Sheriff Filla in his official capacity.  *See* Doc. 1 at 2 (Compl. ¶ 4).  This court subsequently granted plaintiff permission to file her Second Amended Complaint naming the current Sheriff—Mr. Friend—as the defendant sued only in his official capacity.  *See* Doc. 88.  The office of Linn County Sheriff is the "real party in interest" here, regardless of who occupies the position.

In sum, that Sheriff Friend didn't hold his office until after the events at issue provides no reason to grant him summary judgment.  The court overrules this aspect of his motion.[10]

---

[10]    The court notes defendant's reliance on two Western District of Virginia cases where that court declined to apply successor liability.  Doc. 115 at 34 (first citing *Skeen v. Washington Cnty. Sheriff's Off.*, No. 1:20CV00017, 2020 WL 6688550 (W.D. Va. Nov. 12, 2020); then citing *Oakes v. Patterson*, No. 7:13-CV-552, 2014 WL 1569427 (W.D. Va. Apr. 17, 2014)).  Neither case's holding is germane to the issue here.

B.       **Title IX Claims**

Title IX of the Education Amendments Act of 1972 provides that a recipient of federal

financial assistance may not "on the basis of sex,  . . . exclude[ ] from participation in,  . . . [deny]

the benefits of, or  . . . [subject] to discrimination under any education program or activity" to

any person in the United States.  20 U.S.C. § 1681(a).  Title IX plaintiffs can't impose liability

on a school district or other governmental entity based on vicarious liability or agency theories.

*Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 640 (1999) ("[A] recipient of federal funds

may be liable in damages under Title IX only for its own misconduct."); *Gebser v. Lago Vista*

*Indep. Sch. Dist.*, 524 U.S. 274, 285 (1998) ("[I]t would 'frustrate the purposes' of Title IX to

permit a damages recovery against a school district for a teacher's sexual harassment of a student

based on principles of *respondeat superior*[.]").  Also, courts may not enforce the private cause

of action implied under Title IX against entities who have not received federal funding.  *Davis*,

526 U.S. at 641 (citing *Nat'l Collegiate Athletic Ass'n v. Smith*, 525 U.S. 459, 467 n.5 (1999)).

In short, Title IX imposes liability against a federal funding recipient when it displays

deliberate indifference to known acts of sexual harassment that effectively cause or subject

students to harassment (or makes them more vulnerable to it).  *Id.* at 641–645.  To establish a

triable Title IX claim based on deliberate indifference, plaintiff must adduce admissible evidence

capable of supporting a finding that the funding recipient "'(1) had actual knowledge of, and (2)

was deliberately indifferent to (3) harassment that was so severe, pervasive and objectively

offensive that it (4) deprived the victim of access to the educational benefits of opportunities

provided by the school.'"  *Doe v. Sch. Dist. No. 1*, 970 F.3d 1300, 1308 (10th Cir. 2020) (quoting

*Murrell v. Sch. Dist. No. 1*, 186 F.3d 1238, 1246 (10th Cir. 1999)).  This standard makes clear

that liability based on the deliberate indifference theory requires more than negligence.  So, Title

23

IX liability doesn't lie against a federally funded entity merely for failing "to react

to . . . harassment of which it . . . *should have* known." *Davis*, 526 U.S. at 642. To the contrary,

a school district is liable only when it remains "deliberately indifferent to acts of . . . harassment

of which it had actual knowledge." *Id.* This form of liability is limited "to circumstances where[

] the recipient exercises substantial control over both the harasser and the context in which the

known harassment occurs." *Id.* at 645. Thus, a Title IX plaintiff can't hold a school district

liable where the district "could not have remedied the harassment because it had no knowledge

thereof or had no authority to respond to the harassment[,]" *i.e.*, authority "to take remedial

action." *Murrell*, 186 F.3d at 1246 (quotation cleaned up).

　　　The Tenth Circuit also has recognized that the deliberate indifference standard isn't the

only way that a Title IX plaintiff can hold a defendant liable. A Title IX defendant can assume

liability for its own actions when it violates Title IX through an official policy, which can

include a "policy of deliberate indifference to providing adequate training or guidance that is

obviously necessary for implementation of a specific program or policy of the recipient."

*Simpson v. Univ. of Colo. Boulder*, 500 F.3d 1170, 1178 (10th Cir. 2007). The Supreme Court

has held open "the possibility that evidence of a single violation of federal rights, accompanied

by a showing that a municipality has failed to train its employees to handle recurring situations

presenting an obvious potential for such a violation, could trigger" liability. *Bd. of Cnty.*

*Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 409 (1997); *see also Simpson*, 500 F.3d

at 1178–79 (extending the "obviously necessary" requirement to Title IX cases). This standard

retains the requirement that "the institution itself, rather than its employees (or students), be the

wrongdoer." *Simpson*, 500 F.3d at 1177.

### 1.    Defendants Linn County BOCC and Friend

Defendants Linn County BOCC and Sheriff Friend filed a joint Motion for Summary Judgment (Doc. 113).  In large measure, they rely on the same legal arguments.  Highly summarized, they focus on the first two elements of the *Murrell* standard, contending that plaintiff has adduced no evidence to support her burden on the actual knowledge (first element) and deliberate indifference (second element) to acts of harassment.  Plaintiff responds in kind, lumping these two defendants together as "the Linn County Defendants" in her response to the motion.  Notwithstanding the approach used in the briefing, the legal analysis requires a defendant-specific focus.  So, the court addresses the two defendants separately in subsections a and b, following.

### a. *Linn County BOCC*

#### i.    Actual Knowledge of Harassment

Defendant Linn County BOCC argues that it isn't liable for sexual harassment caused by its employees.  Doc. 115 at 25.  This contention is correct, as funding recipients do not incur liability on a *respondeat superior* theory.  *See Davis*, 526 U.S. at 640; *Gebser*, 524 U.S. at 285. Plaintiff never identifies any evidence that the Linn County BOCC (or even one of its members) ever possessed actual knowledge about Huggins's harassment of plaintiff.  Instead, plaintiff aims all of her evidence of knowledge at Sheriff Filla—including the office of Sheriff before Mr. Filla held this office.  But this approach can't pin liability on the Linn County BOCC because a recipient of federal funds "may be liable in damages under Title IX only for its own misconduct."  *Davis*, 526 U.S. at 640.

Given plaintiff's wholesale failure to come forward with evidence of actual knowledge, no reasonable jury could find that the Linn County BOCC actually knew about Huggins's harassment of plaintiff.

ii.     Policy of Deliberate Indifference

Aside from an actual knowledge claim, plaintiff may survive summary judgment on her Title IX claim if she has adduced evidence that defendant followed an official policy of deliberate indifference.  *Simpson*, 500 F.3d at 1178.  Plaintiff here has argued defendants maintain a policy of deliberate indifference by failing to train their employees in Title IX, and a policy of deliberate indifference by not investigating claims.  Doc. 109 at 15 (Pretrial Order ¶ 4.a.).  In her opposition to the motion, plaintiff also claims an official policy of deliberate indifference for failing to supervise Huggins.  Doc. 125 at 31.  Defendants argue that the court— because plaintiff omitted this "failure to supervise" claim in the Pretrial Order—should disregard this theory.  Doc. 131 at 30.

The Federal Rules of Civil Procedure provide that a pretrial order "controls the course of the action unless the court modifies it."  Fed. R. Civ. P. 16(d).  Accordingly, a pretrial order supersedes all pleading documents covered by Rule 8.  *Weyerhaeuser Co. v. Brantley*, 510 F.3d 1256, 1267 (10th Cir. 2007); *see also Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th Cir. 2002) ("[T]he pretrial order is the controlling document for trial." (quotation cleaned up)).  Counsel bears the burden to ensure the accuracy of the parties' positions on facts, legal theories, and other matters.  *Turner v. Unified Gov't of Wyandotte Cnty./Kansas City, Kan.*, No. CV 18-2202-KHV, 2020 WL 1888837, at *2 (D. Kan. Apr. 16, 2020) (citing *Hung Duc Bui v. IBP, Inc.*, 201 F.R.D. 509, 512 (D. Kan. 2001)).  Thus, all "claims, issues, defenses, or theories of damages not included in the pretrial order are waived even if they appeared in the complaint[.]"  *Muckala*, 303

F.3d at 1215.  When deciding whether a pretrial order includes a particular claim, a court must construe the pretrial order liberally "'to cover any of the legal or factual theories that might be embraced by [its] language.'"  *Zenith Petroleum Corp. v. Steerman*, 656 F. App'x 885, 887 (10th Cir. 2016) (quoting *Trujillo v. Uniroyal Corp.*, 608 F.2d 815, 818 (10th Cir. 1979)).  But the primary purpose of the pretrial order remains to "avoid surprise by requiring parties to 'fully and fairly disclose their views as to what the real issues of the trial'" will include.  *Id.* (quoting *Cortez v. Wal-Mart Stores, Inc.*, 460 F.3d 1268, 1276–77 (10th Cir. 2006)).

Plaintiff's statement of her Title IX claim in the Pretrial Order never even mentions a theory of liability based on a failure to supervise.  Doc 109 at 15 (Pretrial Order ¶ 4.a.).  Instead, she asserts her claims under "Title IX against [defendants] because [defendants] had actual notice that David Allen Huggins was sexually harassing other female minors and [p]laintiff, and then [were] deliberately indifferent by not investigating the allegations and had no training program to prevent violation of Title IX."  *Id.*  Although plaintiff's Title IX claim as asserted in the Pretrial Order doesn't mention a failure to supervise, she asserts this theory nonetheless in her opposition to all three defendants' motions.  Doc. 124 at 29–30; Doc. 125 at 31.

While the court understands it must construe the Pretrial Order liberally, plaintiff's construction here goes too far.  Construing plaintiff's statement of her Title IX claim to include a failure to supervise theory would unfairly surprise defendants.  Three related reasons lead the court to this conclusion.

*First*, plaintiff explicitly asserts a failure to supervise theory in her § 1983 claim against these same defendants in Count I of the Pretrial Order.  Doc. 109 at 15 (Pretrial Order ¶ 4.a.).  Thus, it's evident plaintiff knows she should include such a theory explicitly when she means to assert one, and how to do it.  Yet, she omitted such a theory in her Title IX claim.  *Id.*  To permit

plaintiff's Title IX claims to survive summary judgment on a failure to supervise theory would prejudice defendants.  Plaintiff failed to give them fair notice of this theory and deprived them of the opportunity to seek summary judgment against it.  *See Reams v. City of Frontenac, Kan.*, 587 F. Supp. 3d 1082, 1100 n.7 (D. Kan. 2022) ("A plaintiff cannot escape the binding effect of a pretrial order by raising new issues in a response to the defendant's motion for summary judgment."); *Bednasek v. Kobach*, 259 F. Supp. 3d 1193, 1212 (D. Kan. 2017) ("Plaintiff should have disclosed to Defendant his general claims of relief. The fact that it was not disclosed until the response to Defendant's summary judgment motion certainly caused him prejudice.").

*Second*, plaintiff only asserts the "failure to supervise" theory under § 1983 in the Pretrial Order against the Linn County defendants, not USD 344.  Construing the Pretrial Order liberally to include a "failure to supervise" in the language of the Title IX claim against USD 344 doesn't allow that defendant to test the theory at summary judgment.

*Third*, the court grants summary judgment below against all remaining § 1983 claims. Thus, including the "failure to supervise" theory for Title IX claims after excising the only place where plaintiff included it in the Pretrial Order doesn't give the Linn County defendants adequate warning to prepare a defense, because they could reasonably believe the court's summary judgment order had disposed of it.  Under these circumstances, the court agrees with defendants in holding that plaintiff can't assert a failure to supervise theory for her Title IX claim because she waived it by not including it in her statement of claims in the Pretrial Order.

Turning to the theories of this claim that plaintiff did include in the Pretrial Order, plaintiff contends defendants should have recognized the obvious need to provide Title IX training to Huggins.  Doc. 125 at 31.  Plaintiff's argument fails to distinguish between LCSO's alleged duty to train and the one owed by Linn County BOCC.  Our Circuit has held that a

failure to train theory turns on a "policy of deliberate indifference to providing adequate training or guidance that is obviously necessary for implementation of a specific program or policy of the [federal funding] recipient." *Simpson*, 500 F.3d at 1178. Deliberate indifference "'is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.'" *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (quoting *Bryan Cnty.*, 520 U.S. at 410). In the § 1983 context, the Tenth Circuit previously has held that sexual assault isn't an obvious consequence of insufficiently training law enforcement officers. *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 774 (10th Cir. 2013) ("'[S]pecific or extensive training hardly seems necessary for a jailer to know that sexually assaulting inmates is inappropriate behavior.'" (quoting *Barney v. Pulsipher*, 143 F.3d 1299, 1308 (10th Cir. 1998))). This court previously found *Schneider* instructive when addressing plaintiff's failure to train theory under § 1983. *See* Doc. 96 at 14. Defendants argue this court should apply the same reasoning here on plaintiff's Title IX claim because the failure to train theory is the same regardless of the substantive statute invoked. Doc. 131 at 31 (citing *Simpson*, 500 F.3d at 1175–76, 1179). The court agrees.

In *Simpson*, our Circuit adopted Supreme Court guidance from *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989), which interpreted § 1983 to hold that "the need to train officers in the constitutional limitations on the use of deadly force can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." *Simpson*, 500 F.3d at 1178–79 (quoting *Canton*, 489 U.S. at 390 n.10). The Circuit's incorporation of § 1983 principles in its construction of Title IX suggests that it intends these broad principles to apply in both settings. *See id.* Thus, this court's earlier interpretation of *Schneider*, *i.e.*, holding that specific training isn't necessary for law enforcement officers to

know about inappropriate behavior in the context of a § 1983 claim applies equally here to the Title IX claim.  The court holds additional training in Title IX is not required for law enforcement personnel to know that they shouldn't sexually assault others—let alone do so in schools.  Not providing such training to Huggins doesn't amount to a failure to train by defendant Linn County BOCC.

Finally, plaintiff argues, defendants maintained an official policy of deliberate indifference by not investigating claims made against Huggins.[11]  Doc. 125 at 26–28.  Again, plaintiff doesn't distinguish between LCSO and Linn County BOCC, and their respective duty to investigate.  Here, plaintiff hasn't adduced any summary judgment evidence to provide Linn County BOCC cause to investigate.  Nothing suggests that Linn County BOCC knew of any inappropriate behavior or reported complaints.  The absence of such evidence precludes a reasonable jury from finding that the Board maintained an official policy of indifference because it didn't investigate.

In sum, plaintiff fails her burden to prove defendant Linn County BOCC had actual knowledge of sexual harassment or an official policy of deliberate indifference to complaints of sexual harassment.  Thus, the court grants summary judgment in defendant Linn County BOCC's favor on plaintiff's Title IX action.

### b.  Sheriff Friend

#### i.   Actual Knowledge of Harassment

Defendant Friend argues that LCSO lacked actual knowledge of harassment until they learned about plaintiff's pregnancy.  Doc. 115 at 26.  The actual knowledge standard is a high

---

[11]      Because of the overlapping nature of the claims and corresponding evidence, the parties frequently make arguments under one cause of action but don't make the same argument when addressing another cause of action.  The court does its best to interpret the parties' arguments made in furtherance of one cause of action as applying to others, where appropriate.

bar.  *See, e.g.*, *Gebser*, 524 U.S. at 290 ("[A] damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond."); *Murrell*, 186 F.3d at 1246 ("That standard makes a [recipient of federal funds] liable only where it has made a conscious decision to permit sex discrimination in its programs, and precludes liability where the [recipient] could not have remedied the harassment because it had no knowledge thereof or had no authority to respond to the harassment."); *M.E. v. Alvin Indep. Sch. Dist.*, 840 F. App'x 773, 775 (5th Cir. 2020) ("Precedent from the Supreme Court and our court illustrates the difficulty of meeting this actual knowledge requirement.").

To prevail on a Title IX claim, our Circuit noted that a "plaintiff must show an appropriate person . . . had 'actual knowledge of discrimination *in the recipient's [ ] programs*.'" *Escue v. N. Okla. Coll.*, 450 F.3d 1146, 1153 (10th Cir. 2006) (quoting *Gebser*, 524 U.S. at 290 (emphasis added by Circuit's opinion)).  Explaining that discrimination within the program will suffice, the Tenth Circuit held that "harassment of persons other than the plaintiff may provide the school with the requisite notice to impose liability under Title IX."  *Id.*  Once a federal funding recipient acquires actual knowledge of harassment, the recipient's deliberate indifference to it "must, at a minimum, cause students to undergo harassment or make them liable or vulnerable to it."  *Davis*, 526 U.S. at 645 (quotation cleaned up).

In his papers, defendant Friend addresses two incidents he believes plaintiff plans to invoke to prove LCSO's actual knowledge:  (1) the August 2017 parent email about Huggins attempting to contact a student on social media, and (2) the 2011 LCPD investigation of Huggins's conduct toward a teen girl.  Doc. 115 at 26.  Defendants assert that these two instances

don't "come close to providing Linn County with actual notice of a substantial risk Huggins

would have sex with a student." *Id.*

In her response, plaintiff adds two other incidents that, she argues, manifest evidence

presenting a triable issue of LCSO's actual knowledge:  (1) school board member McKee's

report to LCSO in the spring about parents complaining that Huggins drove plaintiff home, and

(2) LCSO's receipt—on two occasions—of reports about plaintiff and Huggins's behavior at

Garrett's BBQ.  Doc. 125 at 32.  Defendants respond, arguing that none of these incidents come

"close to the sexual assault that forms the basis of the Title IX claim."  Doc. 131 at 29.  Because

of this disparity—*i.e.*, what they knew versus what's required for a Title IX claim—defendants

argue that the known incidents didn't "provide Linn County with actual knowledge that Huggins

presented a substantial risk of sexually abusing [p]laintiff." *Id.*  Defendants also assert that

LCSO had no reason to investigate Huggins's behavior until at least October 2017 when,

defendants claim, Sheriff Filla first learned about plaintiff and Huggins's interactions at Garrett's

BBQ.  Doc. 115 at 28.  Defendants note that, as of October 2017, other evidence strongly

suggested the former student had impregnated plaintiff.  *Id.*  This contention is contradicted by

other summary judgment facts that LCSO Deputy More had discounted the former student as the

father by September.  Doc. 115-9 at 1–3 (More Aff. ¶¶ 4, 9).  Regardless, defendants contend

LCSO responded appropriately by notifying the KBI, cooperating with the KBI's investigation,

and removing Huggins from the school by late October, when it learned of Huggins's potential

involvement.  Doc. 115 at 28.

Plaintiff contends that Sheriff "Filla received notice but did not respond to the report of

Huggins taking [plaintiff] home from school" in May 2017.  Doc. 125 at 32.  But plaintiff

doesn't support her contention with any evidence, and this assertion conflicts with other evidence

in the summary judgment record.  LCSO Detective Johnson testified that he had heard from McKee about Huggins giving rides to plaintiff in May 2017.  Doc. 125-5 at 8–9 (Johnson Dep. 24:9–25:14).  But the first indication provided in evidence that Sheriff Filla received this information was in Detective Johnson's Oct. 28 email, after LCSO had removed Huggins as SRO.  Doc. 125-8 at 1–2.  Plaintiffs asserting a Title IX claim must show that "they brought the situation to the attention of an official . . . who had the 'authority to take corrective action' to remedy the harassment[.]"  *Morse v. Regents of the Univ. of Colo.*, 154 F.3d 1124, 1127–28 (10th Cir. 1998) (reporting harassment to university dean and affirmative action officer was sufficient (quoting *Gebser*, 524 U.S. at 290)).  Defendants concede, for the purpose of the current motion, that Sheriff Filla counts as an appropriate person with the authority to take corrective action.  Doc. 115 at 28 n.2.  But Detective Johnson was a LCSO detective during the relevant events, and plaintiff hasn't provided any admissible evidence to show he had supervisory or disciplinary authority over Huggins.  The summary judgment facts thus don't permit a reasonable jury to find or infer that Detective Johnson was an official with authority to take corrective action for the purposes of this claim.  As Detective Johnson was the only person to know about McKee's statement before Sheriff Filla removed Huggins, no reasonable factfinder could find or infer that this statement is evidence of actual knowledge.

Likewise, the court doesn't find persuasive plaintiff's assertion that the 2011 LCPD investigation constitutes advance knowledge, either.  As already stated, prior harassment need not have occurred against the plaintiff herself to qualify as actual knowledge of harassment. *Escue*, 450 F.3d at 1153 (citing *Gebser*, 524 U.S. at 290).  But this principle is limited.  Our Circuit has held that events "too dissimilar, too infrequent, and/or too distant in time to provide the school with actual knowledge of sexual harassment in its programs" don't meet the standard

to survive summary judgment.  *Id.* (quotation marks omitted).  The LCPD investigation here fails

all three prongs.  *First*, it doesn't encompass behavior of a similar nature to Huggins's conduct

involving plaintiff.  The 2011 incident involved Huggins referring to a teenage girl as "fat ass"

outside of her presence.  While defendants concede that Huggins's behavior was inappropriate,

no reasonable jury could find or infer that the incident—by itself or in combination with the

other evidence provided—constitutes actual knowledge showing that LCSO knew of of a

"substantial risk of abuse or harassment to students."  *Id.* at 1154.  *Second*, as this 2011 event is

the only incident provided in evidence from Huggins's time with LCPD, it fails the frequency

prong.  And *third*, because the 2011 investigation took place almost six years before this case's

events, it fails the staleness prong.  As a result, this evidence can't sustain plaintiff's burden to

show LCSO's actual knowledge.

In contrast, the other incidents plaintiff identifies are a different story.  The report of

Huggins's behavior with plaintiff at Garrett's BBQ could qualify as actual knowledge.

Defendant Friend contends that the reports of this behavior didn't reach LCSO until October

2017.  Doc. 131 at 27.  He notes that by the date when "More and Johnson learned this

information, Plaintiff already had sex with Huggins, became pregnant, and had an abortion."  *Id.*

The court doesn't agree with defendant's characterization that LCSO's window for liability

ended after plaintiff had an abortion, particularly because Huggins's sexual relationship with

plaintiff continued after that date, potentially constituting additional Title IX violations.  But

similar to the above analysis of reports from parents to McKee, nothing in the summary

judgment record shows that either Deputy More or Detective Johnson is an appropriate person

with authority to take corrective action.  It's unclear exactly when Sheriff Filla first heard about

the incident.  According to defendant Friend, Deputy More learned about the incident in

September or October, then told Filla, who "promptly reported it to the KBI[.]"  Doc. 124-11 at 3 (Defs. Answers to Pl. Interrog. ¶ 4).  Determining when this transmission to Sheriff Filla occurred, and its proximity to Huggins's removal as SRO, is a difficult task.  Doc. 115-3 at 9–10 (Filla Dep. 36:1–39:12).  Because the parties dispute what Sheriff Filla knew—and more importantly, when he knew it—a reasonable jury could resolve this question in either direction. Such a fact, if proven, remains a central issue to disposition of this case.  Thus, the issue of LCSO's actual knowledge involves a genuine dispute of material fact.

Finally, the August parent email leaves no doubt that Sheriff Filla received it and read it by August 4.  Doc. 124-9 (Pl. Ex. I).  As with the 2011 LCPD investigation, the August parent email does not pass the frequency test in determining actual knowledge.  But the prongs of *Escue*'s test are not required elements, and are, instead, factors the court weighs in determining whether defendants had actual knowledge.  *Escue*, 450 F.3d at 1153 (stating that actual knowledge requirement isn't satisfied if prior events are "too dissimilar, too infrequent, *and/or* too distant in time" (emphasis added)).  Here, the August email isn't too temporally distant from the events of this case.  The message was sent on August 3, shortly before Huggins first had sex with plaintiff and around the time when Huggins's text and social media messages to plaintiff became sexual in nature.  Defendants argue this alleged conduct is too dissimilar to Huggins's sexual relationship with plaintiff.  Doc. 115 at 22.  But as Huggins's social media messages to plaintiff were sexual in nature, a jury reasonably could find or infer that they themselves comprise a Title IX offense.  Huggins's attempts to contact students through Facebook—against school policy—are substantially similar to the conduct at issue in this plaintiff's claim.

Defendant Friend also contends that plaintiff didn't provide any evidence "about what the parents' purported 'concerns' were other than that Huggins [had] sent a student a friend request

on social media[.]"  Doc. 131 at 32.  But our Circuit has held that the standard for actual notice isn't "'so high that a [federal funding recipient] is not put on notice until it receives a clearly credible report of sexual abuse from the plaintiff-student.'"  *Escue*, 450 F.3d at 1154 (quoting *Doe v. Sch. Admin. Dist. No. 19*, 66 F. Supp. 2d 57, 62 (D. Me. 1999)).  On the contrary, the Circuit explained that a "clearly credible" prior episode isn't necessary because, "at some point," supervisors know "'that a school employee is a substantial risk to sexually abuse children.'"  *Id.* (quoting *Gordon v. Ottumwa Cmty. Sch. Dist.*, 115 F. Supp. 2d 1077, 1082 (S.D. Iowa 2000)). So, under our Circuit's reasoning, it doesn't matter that a defendant couldn't verify the claims at the time to determine if they had actual knowledge.  Ultimately, though, a single event of prior conduct with others is "plainly insufficient to alert [defendant] to the possibility" that Title IX violations are occurring.  *Gebser*, 524 U.S. at 291.  Because of this limitation, the parent's email in August wouldn't *by itself* support a finding or inference that defendants had actual knowledge of harassment.

But by August 2017, an email had accused Huggins of violating a school district policy against contacting students via social media.  The district put this policy in place because of a recent similar incident of harassment, when a teacher inappropriately messaged a student.  Doc. 115-4 at 7 (Laver Dep. 27:5–19); Doc. 125-2 at 3 (Defs. Answers to Pl. Interrog. ¶ 5).  Sheriff Filla was aware of—and involved in—the arrest of the teacher who had sent the earlier inappropriate message and the related seizure of the teacher's phone.  Doc. 125-2 at 3 (Defs. Answers to Pl. Interrog. ¶ 5).  The teacher harassment incident resembled the parent's complaint about Huggins's social media activity.  And the earlier harassment wasn't too remote in time. *See Ross v. Univ. of Tulsa*, 180 F. Supp. 3d 951, 968 (N.D. Okla. 2016) (holding that similar conduct some two years before the conduct at issue wasn't too distant in time); *D.G. v. Tucson*

36

*Unified Sch. Dist.*, No. CV1800583TUCJGZMSA, 2021 WL 1087419, at *3 (D. Ariz. Feb. 26, 2021) (holding that a pattern of similar conduct over a span of eight years before the conduct at issue wasn't too distant in time).  Even though the earlier incident didn't take place in the SRO program, it happened in the Pleasanton School District, it involved a school employee engaging in conduct similar to Huggins's, and both Sheriff Filla and Superintendent Laver personally were involved in handling the earlier incident.  Viewed together, these two incidents could lead a reasonable jury to find or infer that Filla had actual knowledge that Huggins presented an increased risk of sexual harassment.

Plaintiff argues—citing testimony from defendant Linn County BOCC's expert witness Hugh Mills and LCSO Detective Johnson—that LCSO should have investigated Huggins's social media after receiving the email.  Doc 125 at 27.  Defendant Friend disagrees, arguing that these witnesses formed their opinions after the fact based on information known now.  Doc. 131 at 32–33.  But Huggins violated a school district communication policy shortly after it was enacted in response to an earlier harassment incident involving similar behavior.  And since our Circuit has maintained that officials should recognize that school employees, at some point, present substantial risks for sexually abusing children, defendant Friend's assertion that Detective Johnson testified solely based on hindsight doesn't pass muster.  Our Circuit has adopted the principle that "a 'minimalist response is not within the contemplation of a reasonable response[.]'"  *Escue*, 450 F.3d at 1155 (quoting *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 260 (6th Cir. 2000) (holding that a school district couldn't "satisfy its obligation where a student has been raped by merely investigating and absolutely nothing more.")).

If conducting a hollow investigation is a "minimalist response," then doing less than that can't suffice.  In the current case, both Superintendent Laver and Sheriff Filla told Huggins not

to contact students on social media and left it at that.  Neither asked to see his messages to verify that he hadn't contacted other students.  In his response to Superintendent Laver about the incident, Sheriff Filla wrote that he didn't "want to lose [Huggins] for any reason but STUPID stuff would really hurt."  Doc. 125-9 at 2.  The court concludes that a reasonable jury could find Sheriff Filla's decision not to investigate his deputy—particularly in light of his stated desire not to lose Huggins—amounts to deliberate indifference to a known substantial risk.

In *Escue*, our Circuit held that the school involved in that case didn't have actual knowledge of harassment based on the reports it had received.  450 F.3d at 1154.  But those reports included two episodes of behavior that didn't involve harassment and two distant-in-time episodes of harassment.  *Id.*  Given those conditions, our Circuit determined the school "simply did not have the requisite knowledge based on prior complaints to believe [a professor] presented a substantial risk of abuse or harassment to students."  *Id.*

By contrast, plaintiff here has adduced evidence of at least two episodes of reported behavior that are neither remote nor dissimilar.  *First*, Sheriff Filla received the parent's email on August 3, 2017, alleging that Huggins attempted to contact another student on social media.  Plaintiff argues that defendants—had they reviewed Huggins's social media and messages when Sheriff Filla received that email—would have found evidence of Huggins's inappropriate sexual messages to plaintiff.  Doc. 125 at 32.  *Second*, a genuine dispute of material fact exists over when Sheriff Filla learned about Huggins and plaintiff's conduct at Garrett BBQ.  It's unclear how quickly Sheriff Filla acted to remove Huggins as a SRO.  In sum, evidence in the summary judgment record permits a reasonable jury to find or infer that:  (a) the LCSO knew of the increased risk that Huggins would sexually harass plaintiff; and (b) Sheriff Filla was deliberately

indifferent to that risk.  While Sheriff Filla denies such knowledge, this dispute is a genuine one and it's about a material fact.  It thus precludes summary judgment.

ii.    Policy of Deliberate Indifference

Plaintiff also claims LCSO maintained a policy of deliberate indifference by failing to train and failing to investigate.  The court earlier addressed plaintiff's inclusion of a failure to supervise theory and the failure to train for defendant Linn County BOCC.  *See supra* Part III.B.1.a.ii. (concluding that plaintiff can't add a failure to supervise theory that wasn't included in the Pretrial Order and that not providing Title IX training to Huggins doesn't amount to a failure to train).  The court adopts the same reasoning and applies it here to defendant Friend.  It thus concludes that plaintiff can't succeed in her Title IX claim against LCSO on either a failure to supervise or a failure to train theory.

In contrast, the failure to investigate claim against LCSO requires an independent analysis.  Plaintiff argues that LCSO maintained an official policy of deliberate indifference by not investigating claims made against Huggins.  Doc. 125 at 26–28.  In response, defendant Friend contends that nobody "had reason to believe Huggins's behavior with [p]laintiff should be investigated until October 2017, at the earliest[.]"  Doc. 115 at 28.  On this point, the parties disagree.

Plaintiff doesn't contend that LCSO maintained an explicit policy against investigating claims.  But "[o]fficial municipal policy includes . . . practices so persistent and widespread as to practically have the force of law."  *Connick*, 563 U.S. at 61.  The Tenth Circuit has held that acts which "do not rise to the level of official policy may nonetheless create liability if they are sufficiently widespread and pervasive so as to constitute a 'custom.'"  *Murrell*, 186 F.3d at 1249–1250; *see also Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114,

1125 (10th Cir. 2008) ("In the absence of an official policy, a municipality may still be liable for the widespread and persistent practice of sexual harassment which constitutes a custom."). Demonstrating a custom or practice of not investigating allegations requires a showing that (1) the federal funding recipient engaged in a "'continuing, widespread, and persistent pattern of misconduct;'" (2) officials demonstrated "'deliberate indifference to or tacit authorization of the conduct'" after receiving notice; and (3) injury resulted to plaintiff from the conduct. *J.M. ex rel. Morris v. Hilldale Indep. Sch. Dist. No. 1-29*, 397 F. App'x 445, 456 (10th Cir. 2010) (quoting *Rost*, 511 F.3d at 1125). Federal funding recipients meet the "deliberately indifferent" standard when "the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648. In appropriate cases, courts—on a motion for summary judgment—may "identify a response as not 'clearly unreasonable' as a matter of law." *Id.* at 649.

Plaintiff cites several instances of behavior that she contends LCSO should have investigated but, instead, were deliberately indifferent to them. Again, plaintiff argues the 2011 LCPD investigation of Huggins should have provided an impetus to investigate any of his behavior as "an adult man with a history of inappropriate behavior toward underage girls." Doc. 125 at 26. For reasons explained above, the court doesn't find this evidence persuasive. S*ee supra* Part III.B.1.b.i. (holding that the LCPD investigation of this episode is too dissimilar, too remote in time, and too infrequent to give LCSO any indication that Huggins was a substantially higher risk for sexually assaulting students). Thus, no reasonable jury could find or infer from that particular episode that defendants had a policy of not investigating claims against Huggins.

In contrast, the other incidents plaintiff introduces are more persuasive. *First*, plaintiff cites the conversation McKee had with Detective Johnson in May 2017 about parents reporting

concern that Huggins was giving rides to plaintiff.  Doc. 125 at 25.  *Second*, plaintiff references LCSO officers' observations of Huggins and plaintiff acting inappropriately at the Linn County Fair.  *Id.  Third*, plaintiff discusses the parent email and alleges Sheriff Filla's response was inadequate.  *Fourth*, plaintiff cites Huggins's conduct with plaintiff at Garrett's BBQ.  *Id.* at 26.  *Finally*, plaintiff cites Detective Johnson's statement that as "news of [plaintiff] becoming pregnant broke[,] Deputy More stated his daughter had made mention of how students were talking about how much time [plaintiff] spent in [Huggins's] office."  Doc. 125-8 at 2; *see also* Doc. 125 at 26.  In response, defendant Friend cites three grounds that, he contends, refute plaintiff's contentions of failure to investigate:  (1) plaintiff relies on hearsay evidence, (2) allegations were too vague, and (3) LCSO properly acted upon information when authorities learned of it.

As for defendant Friend's first contention—hearsay evidence only—the court already has addressed this argument.  *See supra* Part I.A. (concluding that the statements plaintiff relies on are not offered to prove the truth of the matter asserted but, instead, to demonstrate members of LCSO had notice of allegations about troubling behaviors).  Plaintiff isn't alleging that the statements conveyed to LCSO personnel necessarily were true.  Instead, she argues, officers should have investigated the hearsay reports to determine whether they were true.

Also, the court already addressed the issue of vague allegations.  *See supra* Part III.B.1.b.i. (concluding that our Circuit does not require clearly credible reports of harrassment for a defendant to have actual knowledge).  An allegation doesn't need to rise to the level of "'a clearly credible report of sexual abuse from the plaintiff-student'" to constitute actual knowledge.  *Escue*, 450 F.3d at 1154 (quoting *Dist. No. 19*, 66 F. Supp. 2d at 62).  This is particularly true in cases like this one, *i.e.*, where supervisors should understand "'a school

employee is a substantial risk to sexually abuse children.'" *Id.* (quoting *Gordon*, 115 F. Supp. 2d at 1082). Our Circuit has held that vague allegations can provide the conditions for actual knowledge of harassment. Not applying that same reasoning to a failure to investigate theory of deliberate indifference would seem inconsistent with that principle, particularly when investigating is the means to procure actual knowledge. If a funding recipient could decline to investigate accusations that it deems too vague, thereby sidestepping actual knowledge, it would undermine the system of reporting that Title IX is meant to promote. The court thus applies that standard and rejects defendant Friend's vagueness argument doesn't justify summary judgment.

Finally, defendant Friend argues that LCSO responded appropriately when it received information about Huggins's behavior. Plaintiff disputes this contention. The parties particularly disagree about the parent email sent in August 2017. The court already has addressed Sheriff Filla's arguable deliberate indifference to actual knowledge resulting from this email. *See supra* Part III.B.1.b.i. (concluding that a reasonable jury could find or infer that LCSO had actual knowledge of Huggins's increased risk of harassment). The question remains whether a jury will find that failing to investigate was widespread enough to constitute a custom. The official policy for the SRO program is found in the MOU between the districts and LCSO. The MOU designates the Sheriff as the responsible party for ensuring that the SRO is "following all applicable laws." Doc. 111-5 at 3. A reasonable jury could find that the MOU's assignment of responsibilities imposes a duty to investigate to ensure that SROs are following the law. Did LCSO have a widespread custom of disregarding that duty? The court concludes that plaintiff has failed to adduce facts capable of supporting a jury finding that it did so.

While a reasonable jury could find the parent email should have warranted further investigation without relying on hindsight to provide context for the behavior, the other incidents

provide less evidence that this is the case.  For instance, no reasonable jury could find that Detective Johnson's learning from McKee that some parents had raised concerns about Huggins giving his daughter's friend a ride home after school would necessitate reporting it to the Sheriff for further investigation.  After all, there is nothing illegal about providing a ride in that circumstance.  And even if LCSO had followed up, an investigation likely wouldn't have turned up any evidence of illegal behavior at that point, according to plaintiff's testimony.  *See* Doc. 115-5 at 3–4 (Pl. Dep. 48:12–51:8).

Also, the incident at the fair can't support a reasonable finding or inference of a custom of failing to investigate potentially illegal behavior.  Detective Johnson's testimony recounting his interview with Feagins reported only that LCSO officers saw plaintiff asking about Huggins's whereabouts.  Doc. 125-5 at 3 (Johnson Dep. 11:5–9).  No reasonable jury could find that plaintiff asking after her friend's father was an action that should have triggered investigation.  Feagins also stated that he observed Huggins and plaintiff acting flirtatiously, which he found inappropriate.  But Feagins wasn't part of LCSO, and Detective Johnson's testimony didn't explain whether Feagins saw LCSO officers observing the same behavior.  And his testimony that Feagins "reported it up the chain" doesn't describe when that reporting occurred.  *Id.* (Johnson Dep. 11:11–12).  Thus, no reasonable jury could conclude that LCSO should have investigated that incident.

The other incidents encounter similar timeline problems.  As discussed above, evidence is vague about when LCSO learned about the Garrett's BBQ incident.  *See supra* Part III.B.1.b.i. (concluding that a genuine dispute of facts exists about when Sheriff Filla learned of Huggins and plaintiff's behavior at Garrett's BBQ).  The parties dispute when this happened, so evidence presented at trial could give the jury some reason to find a custom of not investigating.  But

plaintiff's other evidence doesn't accomplish as much.  There's no indication from Detective Johnson's email when Deputy More's daughter first shared the information about plaintiff spending time in Huggins's office.  Plaintiff has adduced no evidence for a jury to determine if the investigation into Huggins had begun by then.

At most, plaintiff alleges two instances—the parent email and the incident at Garrett's BBQ—that a jury could use to find a custom of failing to investigate.  No reasonable jury could conclude that these two instances support a finding of a custom of not investigating the behavior of SROs.

In sum, plaintiff here hasn't discharged her summary judgment burden to show that she has amassed evidence of an official policy or custom of deliberate indifference through a failure to train or failure to investigate.  But a reasonable jury could conclude that LCSO was deliberately indifferent to actual knowledge of an increased risk of harassment toward plaintiff, causing her increased vulnerability to Huggins's sexual harassment.  Thus, the court denies defendant Friend's Motion for Summary Judgment for Friend in his official capacity as Linn County Sheriff against plaintiff's Title IX claim.

## 2.    Defendant USD 344

Like the other defendants, USD 344 principally bases its Motion for Summary Judgment (Doc. 110) against the Title IX claims on the first two elements in the *Murrell* standard.  They argue that the summary judgment facts present no triable issue whether defendants had actual knowledge of or were deliberately indifferent to acts of harassment based on sex.[12]  But it begins with a threshold challenge to the claim.

---

[12]    Defendant's otion concedes for the purpose of summary judgment that the sexual harassment by Huggins fulfills the requirement that the harassment was severe, pervasive, or objectively offensive.  Doc. 111 at 31.

Specifically, defendant USD 344 contends that plaintiff's Title IX claim fails because she hasn't alleged discrimination occurring within an educational program or activity. Doc. 111 at 30. Because Huggins had sex with plaintiff "during the summer prior to school being in session and off [s]chool property," USD 344 contends it has "no liability" under Title IX. *Id.* The court rejects this argument for three reasons.

*First*, defendant USD 344's argument assumes that its liability stems solely from Huggins's first sexual encounter with plaintiff, which occurred in early August 2017. But the summary judgment facts establish that their sexual relationship continued long after the school year began. That their first engagement in sexual intercourse occurred outside the school year doesn't preclude liability for other sexual harassment qualifying as Title IX violations.

*Second*, USD 344's reasoning suggests that anything short of sexual intercourse can't violate a student's rights under Title IX. No court has proposed such a standard, and for good reason. A wide range of behaviors qualify as sexual harassment, and no precedent suggests the court should restrict Title IX liability to acts of sexual intercourse or statutory rape.

*Third*, the Supreme Court has held that a federal funding recipient may incur liability if it "expose[s] its students to harassment or cause[s] them to undergo it under the recipient's programs" and exercises substantial control over the harasser and the context of the harassment. *Davis*, 526 U.S. at 645 (quotation marks omitted). While plaintiff's testimony supports the proposition that Huggins never had sex with plaintiff in the SRO's office at the high school, defendant also concedes that Huggins put his hand on her leg and shoulder while in that office, and they made plans there for contact outside of school. Doc. 111 at 34. Evidence also exists that Huggins used his school-supplied computer to send messages to plaintiff on social media. Doc. 124-5 at 13 (Johnson Dep. 34:2–18). These details provide an adequate basis for a jury to

find or infer that plaintiff was exposed to harassment or caused to experience harassment within the school building.  The court isn't persuaded by defendant USD 344's argument that it's not liable as a matter of law because Huggins only had sexual intercourse with plaintiff off school property.

Since the court rejects USD 344's threshold challenge to the Title IX claim, it now turns to the school district's *Murrell*-based arguments.

### a.   Actual Knowledge of Harassment

Defendant USD 344 argues it didn't have actual knowledge of the harassment at issue in this case.  It contends that plaintiff views incidents "with 20/20 hindsight and [she] connect[s] numerous incongruous dots."  Doc. 111 at 32.  The standard for determining actual knowledge is the same one applied to defendants Linn County BOCC and Friend above.  *See supra* Part III.B.1.b.i. (discussing *Gebser*'s requirement of actual knowledge by an official with "authority to address the alleged discrimination . . . and [he] fails adequately to respond").

In her response to USD 344's arguments, plaintiff references two incidents.  They are the same ones used for her claim against LCSO.

*First*, plaintiff mentions the May 2017 meeting where McKee told Detective Johnson he'd heard from parents about Huggins giving plaintiff rides.  Unlike Detective Johnson, a reasonable jury might consider McKee, as a school board member, an appropriate person to receive reports about harassment.  But even so, when McKee received this report, all he knew was that Huggins had given rides to his daughter's friend.  No inappropriate relationship had begun by that point, and McKee had no reason to act.  Detective Johnson said McKee told him that some parents believed this behavior was inappropriate.  But something that "looks" inappropriate is quite different than harassment capable of imposing liability on an entity under

Title IX.  *See Escue*, 450 F.3d at 1154 (holding that the school's notice of prior relationships—even though one may have been improper but didn't violate school policy—didn't constitute actual notice of an increased risk of sexual harassment).  With the benefit of hindsight, onlookers now can see Huggins laying the groundwork for his eventual harassment and crimes.  But when McKee received the report, Huggins had violated no laws or policies.  The reported behavior is too dissimilar for a reasonable jury to find or infer actual notice.

*Second*, plaintiff again brings up the email a parent sent to Superintendent Laver in August 2017.  Superintendent Laver is an appropriate official for purposes of Title IX.  Much of what the court discussed about Sheriff Filla's response to this email applies equally to defendant USD 344's response.  *See* Part III.B.1.b.i., *supra*.  The email involves allegations that Huggins violated a school policy that the district recently had enacted after another incident of sexual harassment by a teacher.  Superintendent Laver also was involved in the arrest and firing of that teacher.  Doc. 124-2 at 3 (Def. Answers to Pl. Interrog. ¶ 5).  In response to the email, Superintendent Laver told Huggins not to contact students on social media and forwarded the parent email to Sheriff Filla.  The Tenth Circuit has recognized that a supervisory school official, after receiving complaints by others, knows the school's employee represents a substantial risk to sexually harass students.  *See Escue*, 450 F.3d at 1154. Here, given the context of the earlier incident, the email provides an adequate basis for a reasonable jury to find that USD 344 possessed actual knowledge of an increased risk of sexual harassment.

In response, defendant USD 344 argues that, since the email arrived during the summer and doesn't mention plaintiff at all, it can't constitute actual knowledge.  Doc. 111 at 37.  But our Circuit has held that prior complaints from people other than the plaintiff still can convey actual knowledge to the federal funding recipient.  *Escue*, 450 F.3d at 1153.  And, though the email

arrived outside the school year, Huggins's conduct still pertained to his role as a SRO.  This much, a reasonable jury could infer, is demonstrated by the parent contacting the school superintendent—and not the Sheriff—and by Superintendent Laver's response to the report.  Specifically, he contacted Huggins to tell him not to interact with students on social media.  Outside the SRO program, Superintendent Laver has no authority over Huggins.  So, a reasonable jury could infer that the behavior of those involved shows an understanding that this incident involved the SRO program.

As discussed above, our Circuit has held that a minimalist response is not reasonable.  *Id.* at 1155.  Here, besides telling Huggins not to contact students on social media, USD 344 did nothing to address the concerns expressed in the parent's email.  No one checked to see if Huggins was contacting other students on social media, or if he was interacting with them online.  There is no evidence that they followed up with the parent to determine whether other parents had concerns about Huggins, as the email attested.  In fact, Superintendent Laver conceded that he didn't ask for the names of any other parents referenced in the email who allegedly didn't trust Huggins around their daughters.  Doc. 111-1 at 24 (Laver Dep. 24:2–8).  As with LCSO, defendant USD 344's response here was minimalist.  A reasonable jury could find that its minimalist response constituted deliberate indifference to USD 344's actual knowledge of an increased risk of sexual harassment.  This conclusion precludes summary judgment on this basis.

### b.  Policy of Deliberate Indifference

As she did for other defendants, plaintiff claims that USD 344 displayed a policy of deliberate indifference through a failure to train and failure to investigate.  Also, and as before, plaintiff introduces a failure to supervise theory in her Response to the motion.  *See* Doc. 124 at 28–30.  While defendant USD 344 doesn't object to this tactic, the court nonetheless declines to

consider the failure to supervise theory for the same reasons as detailed above.  *See supra* Part III.B.1.a.ii. (concluding that plaintiff can't add a failure to supervise theory that wasn't included in the Pretrial Order).

The court finds plaintiff's failure to investigate theory against USD 344 fails for much of the same reasoning as it does against the other defendants, explained above.  *See supra* Part III.B.1.b.i. (finding that plaintiff can't adduce evidence demonstrating an official policy of not training or investigating that would allow a reasonable jury to find or infer defendants violated plaintiff's rights under Title IX).  To prevail on a failure to investigate claim, a Title IX plaintiff must provide evidence of an official policy, or at least a custom widespread enough to have the force of an official policy.  While the failure of authorities to investigate Huggins's violation of the communication policy stands out, plaintiff doesn't provide any evidence of an official policy not to investigate.  Nor does she cite other actions that could create a widespread school district custom of not investigating sexual harassment allegations.  Thus, a reasonable jury couldn't conclude that Defendant USD 344 had a policy of deliberate indifference for failing to investigate.

Plaintiff's failure to train theory, as it applies to defendant USD 344, centers on USD 344's alleged failure to provide specific Title IX training "in recognizing, preventing, or remedying sexual harassment and assault[.]"  Doc. 124 at 28.  In particular, plaintiff asserts it was obvious that defendant USD 344 "needed to provide training to prevent a recurrence of an adult male sexually harassing a female student, given that it [had] happened just two years earlier."  *Id.* at 29.  Defendant USD 344 responds that the Department of Education didn't require Title IX training until August 2020.  Doc. 111 at 40 (citing 34 C.F.R. § 106).[13]

---

[13]     The regulations require that funding recipients "must ensure that Title IX Coordinators, investigators, decision-makers, and any person who facilitates an informal resolution process, receive

Defendant implies that the absence of a regulation explicitly requiring a particular course of action precludes claims of failure to train liability.  Defendant cites no Title IX authority for its proposition and, unfortunately for USD 344, the law more broadly rejects its proposition.  It holds that "the standard defined is normally a minimum standard" that doesn't "prevent a finding that a reasonable [person] would have taken additional precautions where the situation is such as to call for them."  Restatement (Second) of Torts § 288C (Am. L. Inst. 1965); *see also Smith v. Atl. Richfield Co.*, 814 F.2d 1481, 1487 (10th Cir. 1987) ("'Compliance with governmental air safety regulations is admissible, but not conclusive, evidence in a suit arising out of an airplane crash[.]'" (quoting *Bruce v. Martin-Marietta Corp.*, 544 F.2d 442, 446 (10th Cir. 1976))); *McVicker v. Chesapeake & Ohio Ry. Co.*, 307 F.2d 501, 503–04 (6th Cir. 1962) ("Compliance with all statutory requirements will not in all cases, under any circumstances, absolve one of negligence.").  The court is persuaded that a similar principle applies to the deliberate indifference standard for Title IX.  Neglecting to do so would undermine the intent of our Circuit's "obviously necessary" standard for determining a failure to train.  *Simpson*, 500 F.3d at 1178.  The fact that the Department of Education didn't require training on Title IX until 2020 is instructive, but not dispositive.

This issue hinges on whether the need for defendant USD 344 to train its staff and administrators on Title IX was obviously necessary for implementing the SRO program.  Defendant rebuts plaintiff's assertion that the training was made obvious by the recent sexual harassment two years earlier, arguing that "a rational trier of fact could not find, based on this record, that the operation of the SRO program created a risk of abuse."  Doc. 130 at 16.  The court agrees.  As explained above, our Circuit has concluded that law enforcement personnel

---

training on the definition of sexual harassment . . . [and] how to conduct an investigation and grievance process including hearings, appeals, and informal resolution processes[.]"  34 C.F.R. § 106.45(b)(iii).

don't need extra training to know that sexual harassment is unacceptable behavior. *See Schneider*, 717 F.3d at 774. Superintendent Laver testified that USD 344, while not providing specific Title IX training, had provided other training on topics such as mandated reporter and school policies.[14] Doc. 111-1 at 6–7, 24 (Laver Dep. 6:17–7:2, 24:9–13). Given the context of other training conducted by defendant, including those involving sexual abuse and improper school conduct, no reasonable jury could find it obviously necessary that the district needed to provide Title IX training specifically without other incidents demonstrating that necessity.

For these reasons, the court holds that no reasonable jury could find or infer an official policy of deliberate indifference on this case's summary judgment facts. But it could find that defendant USD 344 was deliberately indifferent to actual knowledge of an increased risk of harassment. Thus, the court denies defendant USD 344's Motion for Summary Judgment against plaintiff's Title IX claim.

### C.     Section 1983 Claims

The Supreme Court based its assessment of recipient liability under Title IX on its earlier jurisprudence involving 42 U.S.C. § 1983. *See Gebser*, 524 U.S. at 290–291 ("The administrative enforcement scheme presupposes that an official who is advised of a Title IX violation refuses to take action to bring the recipient into compliance. . . . Comparable considerations led to our adoption of a deliberate indifference standard for claims under § 1983 alleging a municipality's actions in failing to prevent a deprivation of federal rights was the cause of the violation." (citing *Bryan Cnty.*, 520 U.S. 397 (further citations omitted))). As a result, the legal standard for determining liability under § 1983 resembles that of Title IX.

---

[14]     According to Superintendent Laver, Huggins actually helped conduct the mandated reporter training. Doc. 111-1 at 6–7 (Laver Dep. 6:23–7:2).

"Congress did not intend Title IX to preclude § 1983" claims involving gender discrimination in educational programs. *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 256 (2009). In particular, Title IX protections apply to those institutions receiving federal funds under 20 U.S.C. § 1681, "but § 1983 equal protection claims may be brought against individuals as well as municipalities and certain other state entities." *Id.* at 257; *see also Seamons v. Snow*, 84 F.3d 1226, 1234 (10th Cir. 1996) ("Title IX does not have a comprehensive enforcement scheme, and thus, there is no indication in Title IX that Congress intended to foreclose a Title IX plaintiff from bringing a § 1983 action." (quotation cleaned up)). As with Title IX claims, a plaintiff can't hold defendants liable under § 1983 using a *respondeat superior* theory of liability. *See Bryan Cnty.*, 520 U.S. at 403 (recognizing that "a municipality may not be held liable under § 1983 solely because it employs a tortfeasor."). Instead, "plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Id.* at 404. Specifically, when asserting a § 1983 claim against an entity, plaintiffs must demonstrate (1) that their harm resulted from a constitutional violation, and (2) if so, whether the entity is responsible for the violation. *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 120 (1992).

To prove a governmental entity has caused a constitutional violation, plaintiffs must prove (1) existence of an official policy or custom, (2) a causal relationship, and (3) requisite state of mind. *Burke v. Regalado*, 935 F.3d 960, 998 (10th Cir. 2019). On the *first* element, liability can attach to a policy only when it is "'so well settled and widespread that the policymaking officials of the [governmental actor] can be said to have either actual or constructive knowledge of it yet did nothing to end the practice.'" *Id.* (quoting *Bordanaro v. McLeod*, 871 F.2d 1151, 1156 (1st Cir. 1989)). A similar standard exists for applying

supervisory liability when the supervising body has "'promulgated, created, implemented, or possessed responsibility for the continued operation of a policy' that resulted in a violation of the plaintiff's constitutional rights." *Id.* (quoting *Brown v. Montoya*, 662 F.3d 1152, 1164 (10th Cir. 2011) (quotation cleaned up)).

For the *second* and *third* elements, when plaintiffs claim "that a particular municipal action *itself* violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward." *Bryan Cnty.*, 520 U.S. at 404. Plaintiffs in § 1983 actions against municipal entities "must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.* To prove the necessary state of mind, plaintiffs may show either that (1) an "authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right[,]" or (2) an "action taken or directed by the municipality or its authorized decisionmaker itself violates federal law[.]" *Id.* at 405.

Here, plaintiff alleges that defendants Linn County BOCC and Sheriff Friend violated her Fourteenth Amendment rights by failing to supervise and discipline Huggins. Doc. 109 at 15 (Pretrial Order ¶ 4.a.). Circuit precedent holds "that failure to supervise is only actionable under § 1983 against a defendant who had a duty to supervise." *Serna v. Colo. Dep't of Corr.*, 455 F.3d 1146, 1154 (10th Cir. 2006). To demonstrate deliberate indifference in the failure to supervise context, plaintiff must show that the Sheriff was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 1154–55. Also, the "'failure to supervise gives rise to § 1983 liability . . . only in those situations where there is a history of wide-spread abuse.'" *Canton*, 489 U.S. at 398 (O'Connor, J., concurring) (quoting *Wellington v. Daniels*, 717 F.2d 932, 936 (4th Cir. 1983)).

The summary judgment record here establishes that LCSO memorialized its intent to take on the duty to supervise in the MOU.  Doc. 111-5 at 3.  But plaintiff fails to provide any evidence capable of meeting the first prong, *i.e.*, showing existence of an official policy or custom not to supervise.  She's adduced no evidence of a history of wide-spread abuse.  A Sheriff encounters § 1983 liability whenever he, "in a position of responsibility, knew or should have known of the misconduct, and yet failed to prevent future harm."  *Anthony v. Baker*, 767 F.2d 657, 666 (10th Cir. 1985) (citing to *McClelland v. Facteau*, 610 F.2d 693 (10th Cir. 1979)).  Like the analysis applied to plaintiff's Title IX claims, *see supra* Part III.B.1.b.ii. (holding that no reasonable jury could find or infer a custom of deliberate indifference by failing to train or investigate complaints), plaintiff hasn't amassed evidence allowing a jury to find or infer that defendants maintained a policy resulting in a violation of plaintiff's constitutional rights.  Aside from one parent's email alleging a violation of school communication policies designed to safeguard against sexual harassment, plaintiff doesn't provide evidence of any other incidents reported to Sheriff Filla in a way that would have notified him of a need to supervise Huggins more closely.  In sum, plaintiff can't meet the burden to show a custom of deliberate indifference for failing to supervise, so the court doesn't need to take up the other two prongs of the controlling standard.

The court grants defendants Linn County BOCC and Friend's Motion for Summary Judgement against the § 1983 claim.

### D.    State Negligence Claims

In addition to the Title IX and § 1983 claims, plaintiff asserts state law negligence claims. Because 28 U.S.C. § 1331 confers subject matter jurisdiction over plaintiff's federal claims, and her state law claims form part of the same case or controversy arising under a common nucleus

of operative facts, the court may exercise supplemental jurisdiction over the state claims under 28 U.S.C. § 1367(a).  The court elects to do so here.

On the choice of law issue, the parties have stipulated that Kansas law applies to the negligence claims.  Doc. 109 at 2 (Pretrial Order ¶ 1.d.).

In a negligence action under Kansas common law, the plaintiff must prove that (1) defendant owed a duty to the plaintiff, (2) defendant breached that duty, (3) defendant's breach caused an injury to plaintiff, and (4) plaintiff suffered damages.  *Patterson v. Cowley Cnty.*, 413 P.3d 432, 437 (Kan. 2018).  In a general sense, negligence claims present questions of fact for a jury to decide, not legal questions for the court to rule.  *Elstun v. Spangles, Inc.*, 217 P.3d 450, 453 (Kan. 2009) (citation omitted).  But the question whether a defendant owes a duty of care is a legal determination for the court.  *Id.* (citing *Nero v. Kan. State Univ.*, 861 P.2d 768, 770 Syl. ¶ 1 (Kan. 1993)).  If the undisputed facts establish that a defendant had no duty to act in a certain fashion toward the plaintiff, the court may grant summary judgment against the negligence claim because, absent a duty, defendant is not liable for negligence.  *Id.* (citing *Sepulveda v. Duckwall-Alco Stores, Inc.*, 708 P.2d 171, 173–74 (Kan. 1985)).

When deciding whether a defendant owed a duty to the plaintiff, Kansas has adopted the approach of the Restatement (Second) of Torts.  *Fudge v. City of Kansas City*, 720 P.2d 1093, 1098–99 (Kan. 1986); *see also Williams v. C-U-Out Bail Bonds, LLC*, 450 P.3d 330, 342 (Kan. 2019).  The pertinent provision of the Restatement provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if (a) his failure to exercise reasonable care increases the risk of such harm, or (b) he has undertaken to perform a duty owed by the other to the third person, or (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts § 324A (Am. L. Inst. 1965). To meet the requirement imposed by this Restatement section, the Kansas Supreme Court has held that "the evidence must show the defendant did more than act, but through affirmative action assumed an obligation or intended to render services for the benefit of another." *McGee By & Through McGee v. Chalfant*, 806 P.2d 980, 983 (Kan. 1991). When a defendant assumes a duty, the "'extent of the undertaking defines the scope of the duty.'" *Sall v. T's, Inc.*, 136 P.3d 471, 477 (Kan. 2006) (quoting *South ex rel. South v. McCarter*, 119 P.3d 1, 16 (Kan. 2005)).

### 1.    Defendant Linn County BOCC

Plaintiff alleges a state law negligence claim against defendant Linn County BOCC. Doc. 109 at 15 (Pretrial Order ¶ 4.a.). But she makes no allegations and provides no evidence of actions taken by the board of county commissioners to undertake a duty or render services for students of USD 344. Nor does plaintiff make any allegations against a specific commissioner. As the Kansas Supreme Court has explained, a sheriff's office and its deputy sheriffs aren't "subordinate[s] of the board of county commissioners[,]" but rather "the sheriff is a state officer whose duties, powers, and obligations derive directly from the legislature and are coextensive with the county board." *Bd. of Cnty. Comm'rs of Cnty. of Lincoln v. Nielander*, 62 P.3d 247, 251 (Kan. 2003). And county commissioners aren't "free to usurp the powers of the office of sheriff by controlling the hiring or firing of the deputies and assistants appointed by the sheriff." *Id.*

The SRO program was designed and implemented through an agreement between LCSO and USD 344. Plaintiff hasn't adduced any evidence that defendant Linn County BOCC created or supervised the SRO program. And, as a matter of state law, the board of county commissioners lacks authority to intercede itself into the hiring or firing of deputies or their appointment of duties. *See id.* In sum, since plaintiff can't demonstrate an affirmative action

that defendant Linn County BOCC took to assume a duty to protect students, the court holds that

defendant Linn County BOCC owed plaintiff no duty.  The court thus grants defendant Linn

County BOCC's Motion for Summary Judgment against plaintiff's negligence claim.

### 2. Defendant USD 344

Plaintiff also asserts a state law negligence claim against defendant USD 344.  Doc. 109

at 15 (Pretrial Order ¶ 4.a.).  In her response briefs, plaintiff argues USD 344 negligently

supervised Huggins, leading to a foreseeable harm plaintiff sustained via sexual harassment.

Doc. 124 at 33.  Defendant USD 344 responds that it owed no duty to plaintiff because the harm

she allegedly sustained wasn't foreseeable.  Doc. 111 at 43–44.

Applying Kansas law, the court concludes plaintiff has the better of the argument.  As

mentioned above, Kansas has adopted the Restatement (Second) of Torts to determine the duty

(if any) a defendant owes the plaintiff.  *See Fudge*, 720 P.2d at 1098–99.  Section 320 of the

Restatement identifies one of the special relationships that imposes a duty upon certain parties:

> One who is required by law to take or who voluntarily takes the custody of another
> under circumstances such as to deprive the other of his normal power of self-
> protection or to subject him to association with persons likely to harm him, is under
> a duty to exercise reasonable care so to control the conduct of third persons as to
> prevent them from intentionally harming the other or so conducting themselves as
> to create an unreasonable risk of harm to him, if the actor (a) knows or has reason
> to know that he has the ability to control the conduct of the third persons, and (b)
> knows or should know of the necessity and opportunity for exercising such control.

Restatement (Second) of Torts § 320 (Am. L. Inst. 1965).  The Restatement clarifies that this rule

applies, in particular, "to a sheriff or peace officer, a jailer or warden of a penal institution,

officials in charge of a state asylum or hospital for the criminally insane, or to teachers or other

persons in charge of a public school."  *Id.* cmt. a.  Kansas has adopted this principle for schools,

holding that "high schools act *in loco parentis* with respect to its students."  *Dunn v. Unified Sch.

Dist. No. 367*, 40 P.3d 315, 327 (Kan. Ct. App. 2002); *see also Beshears v. U.S.D. No. 305*, 930

P.2d 1376, 1381 (Kan. 1997) ("Children are released by their parents to the control and supervision of school officials for the time the children are involved in school or school activities.").

In *Beshears*, the Kansas Supreme Court held the school didn't have a duty making them potentially liable for high school students fighting one another off-campus. 930 P.2d at 1383. But the court distinguished the absence of a duty under *Beshears*'s facts from another case where, it held, the school owed a duty to protect a special needs student from sexual assault by a bus driver. *Id.* at 1382–83 ("The duty to control the conduct of a school bus driver to prevent the driver from harming students while the driver is performing his duties is distinguishable from the duty to control driving-age high school males from voluntarily participating in a fight at an off-school, rural location, after school and without the knowledge of school personnel." (citing *Kan. State Bank & Tr. Co. v. Specialized Transp. Servs., Inc.*, 819 P.2d 587 (Kan. 1991))).

Here, the summary judgment facts of Huggins's role and misconduct compares more closely to the bus driver in *Kan. State Bank* than the off-campus student combatants in *Beshears*. The SRO position explicitly falls under the category of those third persons the district can control, and over whom it should "know of the necessity and opportunity for exercising such control." Restatement (Second) of Torts § 320 (Am. L. Inst. 1965). Defendant USD 344 argues that it owed plaintiff no duty primarily because there "is no evidence in the record that sexual misconduct occurred while on school grounds." Doc. 111 at 44. This argument fails to persuade the court for three reasons.

*First*, as the Kansas Supreme Court held in *Kan. State Bank* and recognized again in *Beshears*, in cases involving a third person under the school's control the duty owed to protect students does not end at the campus boundaries. *Second*, and as explained above, a reasonable

jury could find that Huggins didn't confine his sexual misconduct to off-campus acts. The summary judgment facts permit a finding that several acts committed by Huggins on campus qualify as sexual misconduct or furthered his efforts to commit sexual misconduct. *See supra* Part III.B.2. (outlining Huggins's behavior toward plaintiff while in the SRO office or using school equipment). And the Title IX requirement that the acts occurred within the funding recipient's program don't apply to state law negligence claims. So, when it comes to a negligence claim, defendant's arguments against Title IX liability don't function the same way. *Third*, the cases defendant cites to support its claim that the school doesn't owe a duty to students—*Nero*, 861 P.2d 768 (Kan. 1993) and *Weckhorst v. Kan. State Univ.*, 241 F. Supp. 3d 1154 (D. Kan. 2017)— specifically address duties owed to students by universities. Doc. 130 at 20. The Kansas Supreme Court has differentiated between college and high school students:

> The teacher/administrator-student relationship has been said to fall within the in loco parentis doctrine, although the doctrine is outmoded in the context of the university-student relationship. Children are released by their parents to the control and supervision of school officials for the time the children are involved in school or school activities. . . . This case concerns high school sophomores.

*Beshears*, 930 P.2d at 1381 (citing *Nero*, 861 P.2d at 778). So too here. This case's plaintiff was a high school sophomore at the time of the incidents. Defendant USD 344's arguments are unpersuasive.

But there is another way to think about USD 344's duty in this case. The MOU governed the SRO program. Under that agreement, both the school district and LCSO assumed responsibility for supervising the SRO position. Doc. 111-5 at 3–4. Under the MOU, USD 344 agreed to "supervise in relation to the school board's policies and procedures[.]" *Id.* at 4. By endeavoring to provide a service and taking affirmative acts to assume an obligation to supervise, USD 344 assumed a duty not to act negligently when carrying out its obligations. *See McGee*, 806 P.2d at 983 (holding that an actor may still assume liability "to third persons when

he negligently performs an undertaking to render services to another which he should recognize as necessary for the protection of third persons" (citing Restatement (Second) § 324A)).

In sum, the court holds on these summary judgment facts that defendant USD 344 assumed a duty to plaintiff. The issues whether the school district breached that duty and, if so, whether that breach caused damages to plaintiff are matters that a factfinder must decide. *Elstun*, 217 P.3d at 453. The court thus denies defendant USD 344's Motion for Summary Judgment against plaintiff's Kansas negligence claims.

### 3. Defendant Friend

Plaintiff also asserts state law negligence claims against defendant Friend in his official capacity as Linn County Sheriff. Doc. 109 at 15 (Pretrial Order ¶ 4.a.). Plaintiff asserts that the LCSO negligently supervised Huggins, leading to foreseeable harm to plaintiff in the form of his sexual harassment. Doc. 125 at 33. Defendant Friend argues that LCSO owed no duty to plaintiff because the harm she allegedly sustained wasn't foreseeable. Doc. 115 at 30. The standard applied here is the same one previously identified.

Kansas common law typically construes the Restatement to impose a duty of care on law enforcement officers, but only in limited instances where the plaintiff was in their custody. *See, e.g.*, *Keiswetter v. Kansas*, 373 P.3d 803, 810 (Kan. 2016) (holding officers didn't owe a duty to the public for a prison inmate who fatally injured another person while the inmate was on work release); *Jackson v. City of Kan. City*, 947 P.2d 31, 44 (Kan. 1997) (holding officers owed a duty to a man in police custody whose girlfriend cut his throat while his hands were cuffed behind his back); *Jarboe v. Bd. of Cnty. Comm'rs of Sedgwick Cnty.*, 938 P.2d 1293, 1301, 1303 (Kan. 1997) (holding that a county-run juvenile residence facility owed no duty to a victim shot and injured by an escapee). The parties haven't cited, and the court hasn't located, any precedent

that imposed a duty on law enforcement organizations who elected to undertake a joint venture with an educational entity. But on this case's facts, the court need not approach this question as a purely abstract one.

As USD 344 did, LCSO entered into an MOU that governed the SRO program. Doc. 111-5 at 3–4. Under it, LCSO agreed to supervise the SRO's "law enforcement responsibilities and ensure they are following all applicable laws." *Id.* at 3. By electing to provide a service and taking affirmative acts to assume the obligation to supervise, LCSO assumed the same duty as USD 344 did, not to act negligently in fulfilling its obligations.

On these summary judgment facts, the court concludes that LCSO assumed a duty to plaintiff. The court denies defendant Friend's Motion for Summary Judgment against plaintiff's Kansas negligence claims for this reason.

### E.    Proceeding Without Linn County BOCC

Under Kansas law, plaintiff must name the board of county commissioners in "all suits or proceedings" against a county.[15] Kan. Stat. Ann. § 19-105. Our court previously has held that "a suit against a sheriff in his official capacity as a county officer arguably is another way to assert a claim against the county." *Bledsoe v. Bd. of Cnty. Comm'rs of Cnty. of Jefferson, Kan.*, 501 F. Supp. 3d 1059, 1143 (D. Kan. 2020). Naming a county's board of commissioners is a necessity, as "a county is not a legal entity with the capacity to be sued under Kansas law[.]" *Id.* But our Circuit has held it's proper to sue a sheriff in his official capacity as a suit against the entity he represents. *Couser v. Gay*, 959 F.3d 1018, 1026–32 (10th Cir. 2020). And the Kansas Supreme Court has held that sheriffs are "coextensive to the county board" and not "subordinate[s] of the

---

[15]    The statute, in its entirety, reads: "In all suits or proceedings by or against a county, the name in which the county shall sue or be sued shall be 'The board of county commissioners of the county of _____;' but this provision shall not prevent county officers, where authorized by law, from suing in their name of office for the benefit of the county." Kan. Stat. Ann. § 19-105.

board of county commissioners[.]" *Nielander*, 62 P.3d at 251.  Under this reasoning, a suit against the Sheriff is not one against the county for the purposes of Kan. Stat. Ann. § 19-105.

In *Bledsoe*, the court declined "to decide whether, after *Couser*, a plaintiff should name a single defendant for the municipal liability claim" instead of both the board and the sheriff in his official capacity.  501 F. Supp. 3d at 1144.  But here, the court holds that this case may proceed against Sheriff Friend in his official capacity without the county board of commissioners named as a defendant.  The court believes this action comports with the reasoning of both *Couser* and *Nielander*, and is consistent with Kan. Stat. Ann. § 19-105.

## IV.    Conclusion

For reasons explained above, the court grants in part and denies in part defendants' Motions for Summary Judgment (Docs. 110, 113).  The court concludes genuine disputes of material facts remain for the Title IX and state law negligence claims against defendants Friend and USD 344.  In contrast, the court concludes that no genuine dispute of material fact exists for the § 1983 claim against defendant Friend and on all claims asserted against defendant Linn County BOCC.  Those defendants are entitled to judgment as a matter of law on those claims.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Linn County BOCC's Motion for Summary Judgment (Doc. 113) is granted against all claims.

**IT IS FURTHER ORDERED BY THE COURT THAT** the court grants the Motion for Summary Judgment of defendant Sheriff Friend (Doc. 113) against the § 1983 claim but denies the motion on the Title IX and Kansas negligence claims.

**IT IS FURTHER ORDERED BY THE COURT THAT** defendant USD 344's Motion for Summary Judgment (Doc. 110) is denied.

**IT IS SO ORDERED.**

Dated this 16th day of November, 2022, at Kansas City, Kansas.

s/ Daniel D. Crabtree
Daniel D. Crabtree
United States District Judge